**NOT RECOMMENDED FOR FULL-TEXT PUBLICATON**
File Name: 15a0615n.06

No. 14-1727

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Sep 01, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RICHARD SHANNON, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:** **KEITH, CLAY, and STRANCH, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** Defendant-Appellant, Richard Shannon, appeals his conviction and sentence stemming from his involvement in a large-scale Medicare fraud scheme in which twenty-one people were indicted. Shannon was convicted of one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and sentenced to 86 months imprisonment. On appeal, Shannon argues that (1) the district court erred in allowing the Government to introduce his proffer statements into evidence during trial; and (2) the district court's sentence was procedurally unreasonable. We **AFFIRM** the district court's ruling admitting Shannon's proffer statements. However, because the district court's sentence failed to comport with Federal Rule of Criminal Procedure 32(i)(3)(B), we **VACATE** Shannon's sentence and **REMAND** for resentencing.

## I.    BACKGROUND

On October 26, 2012, a jury found Shannon guilty of one count of conspiracy to commit health care fraud.  On May 13, 2014, Shannon was sentenced to 86 months incarceration.  The circumstances surrounding Shannon's conviction are as follows:

In 2008, Shannon met Mohammed Shahab, an owner and operator of various health care agencies in Michigan, through another co-conspirator.  Shannon subsequently agreed to work for Shahab as a "marketer" or "recruiter" for two of Shahab's home health-care agencies:  All American Home Health Care ("All American") and Patient Choice Home Health Care ("Patient Choice").  Both agencies were run by Hassan Akhtar.  Shannon's role required him to obtain account information and signatures on pre-signed medical notes from Medicare beneficiaries in exchange for $50-$100 and/or prescription narcotics.  Shannon then delivered these pre-signed notes to the health care agencies where they were fraudulently signed by medical professionals.  The billing staff then billed the Medicare accounts for services that were not rendered.  Shannon was paid $400-$600 for each "patient" he recruited.  To disguise their illegal scheme as legitimate payment for services rendered to Shahab's agencies, Shahab instructed Shannon to establish his own company in order to submit invoices to Shahab's agencies for payment.  Shannon established Shannon Community Liaison, and Richard Shannon Community Liaison, to receive payment.

On July 13, 2010, an indictment charged Shannon and several others with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349.  On December 3, 2010, Shannon, along with counsel, met with the Government to make a proffer statement.  Prior to the proffer statement, Shannon and his attorney were provided with a proffer agreement, also known as a

*Kastigar* letter. The agreement was signed by the Government, Shannon, and his defense counsel. The agreement provided, in relevant part, that:

> (2) Except as otherwise specified in this letter, no statement made by you or your client during this proffer discussion will be offered against your client in the government's case-in-chief in any criminal prosecution of your client for the matters currently under investigation.
>
> (3) If your client is prosecuted, the government may use your client's statements in cross-examining your client, and to rebut any evidence offered by your client that is inconsistent with the statements made during this discussion. This is to ensure your client does not abuse the opportunity for this proffer discussion by making false or misleading statements, either at the proffer discussion or at trial.

(R. 496-2, Proffer Agreement, Pg ID 2149). During the proffer session, Shannon made several inculpatory statements regarding his involvement in the health care fraud conspiracy.

At Shannon's trial, the Government offered the testimony of Akhtar, who pleaded guilty and cooperated with the Government. Akhtar testified that he ran Shahab's clinics, Patient Choice and All American (R. 622, Trial Transcript, Pg ID 3633), and that he knew Shannon as a recruiter for these clinics. (Id. at Pg ID 3634). Akhtar testified that he paid Shannon $400 for every patient Shannon recruited, and that Shannon claimed to pay each patient between $50 and $100, in addition to prescription pain pills. (Id. at Pg ID 3643, 3640). Akhtar further testified that he received a call from a patient stating that he had not received money that Shannon promised to him. (Id. at Pg ID 3637-39). On cross-examination, the following exchange occurred between Shannon's counsel and Akhtar:

> Q [defense counsel]: Okay. And that's not firsthand knowledge, correct? You didn't see Mr.—Mr. Shannon paying any patients, correct?
> A [Akhtar]: No, sir.
> Q [defense counsel]: Okay. And you didn't direct Mr. Shannon to pay any patients, correct?

3

| | |
|---|---|
| A [Akhtar]: | No, sir. |
| Q [defense counsel]: | That was just the rumor going around in the office, correct? |
| A [Akhtar]: | No. |
| Q [defense counsel] | That wasn't a rumor? |
| A [Akhtar] | It was not a rumor if patient is calling and asking that Shannon had me sign the paperwork and did not give me the money he promised. |
| Q [defense counsel] | Okay. Well, if he didn't pay him the money that he promised, that means he didn't pay them, correct? |
| A [Akhtar] | That's why patient was calling, to get the money. |
| Q [defense counsel] | Okay. I understand that's why they were calling, but they weren't paid, correct? |
| A [Akhtar] | At that time, yes. |
| Q [defense counsel] | Okay. And you have no firsthand knowledge of them actually paying the patient, correct? We've already established that, right? |
| A [Akhtar] | Right, I did not see him because I was in the office. |

(R. 623, Trial Transcript, Pg ID # 3802). On October 16, 2012, in response to this exchange and Shannon's questioning of other witnesses, the Government filed its Motion to Use Statements Made by Defendant Richard Shannon During Proffer Sessions.[1] (R. 496, Pg ID # 2140-58). In its motion, the government asserted that Shannon waived the restrictions on the use of his proffer statements when Shannon's counsel "repeatedly attempted to elicit testimony that [was] inconsistent with [] statements by [Defendant]." The district court found that the defense's cross-examination went "too far," and led to an inference that was inconsistent with Shannon's proffer. (R. 674, Trial Transcript at 19, Page ID 5638). The district court granted the Government's motion to allow introduction of Shannon's proffer statements. The jury found Shannon guilty of one count of conspiracy to commit health care fraud.

---

[1] The Government also asserted that the defense's cross-examination of other witnesses triggered the waiver provision of Shannon's proffer agreement. However, the district court found that the defense's cross-examination of these additional witnesses was merely to test the witnesses' credibility, and thus found no waiver. Therefore, the waiver issue before this Court pertains only to the cross-examination of Akhtar.

4

During sentencing, Shannon objected to the Government's fraud loss calculation.[2] Particularly, Shannon disputed the Government's assertion that he received $186,775.00 from the conspiracy, contending that at trial, the Government had argued and put forth proof only that Shannon profited $55,350.00. Using a statistical extrapolation formula, the Government then calculated the amount of the fraud loss as $1,680,975.00.[3] This amount was derived from an extrapolation of: (1) the total amount paid to Shannon of $186,775.00; (2) divided by an average payment to Shannon of $500 per patient; and (3) multiplied by the average Medicare payment of $4,500 per patient episode. While not disputing that it had only put forth evidence of $55,350.00 at trial, the Government countered that, during the sentencing phase, the court was free to consider evidence of Shannon's other relevant conduct. Thus, the Government submitted, as an exhibit to its Sentencing Memorandum a chart purporting to show additional payments to Shannon. These charts appeared to show that Shannon had actually profited an additional $131,425.00 from separate, but related, schemes of health care Medicare fraud, bringing his profit to $186,775.[4]

The district court accepted the Government's $1,680,975.00 fraud loss calculation, which resulted in a 16-point increase and an advisory guideline sentence range of 92-115 months. The district court sentenced Shannon below the guidelines to 86 months imprisonment. Shannon appeals.

---

[2] Shannon does not challenge or dispute the government's fraud loss calculation formula.

[3] Shannon's Presentence Report also attributed $1,680,975 in fraud loss to Shannon.

[4] The Government asserts that upon further review, it found that Shannon actually received a total of $191,175 from the fraud, but that for purposes of sentencing, it would use the amount identified by the Probation Department in Shannon's Presentence Report.

## II.    DISCUSSION

### A.  *Admission of Proffer Statement*

#### 1.  *Waiver Language*

Shannon first argues that the district court erred in allowing the Government to introduce portions of his proffer statements into evidence.  Specifically, Shannon challenges the district court's determination that he waived the protections of his proffer agreement by offering evidence that was inconsistent with his proffer statements.  Shannon contends that he did not "offer any evidence" because he did not "call any witnesses or put on any defense case." Appellant Br. 20.  The Government, on the other hand, asserts that Shannon waived the protections of his proffer agreement when he cross-examined Akhtar, thereby eliciting responses that were inconsistent with his proffer statements.  This cross-examination, the Government argues, amounts to an "offer of evidence."

 In considering this issue, we engage in a two-part analysis.  We first look at the terms of Shannon's proffer agreement for an interpretation of its contents.  The agreement is a "contract that must be interpreted 'to give effect to the intent of the parties.'" *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005).  "Because the interpretation of a contract is generally a question of law, we first review the first issue de novo."  *Id.*  "If we conclude that the proffer agreement waiver does apply in this case, our second step is to review for abuse of discretion the district court's evidentiary rulings admitting [Shannon's] proffer statements, and we will not reverse unless an error affects a 'substantial right.'"  *Id.*  (internal citations omitted).

Generally, statements made by defendants in proffer sessions are inadmissible under Rule 410 of the Federal Rules of Evidence.  *Barrow*, 400 F.3d at 116.  The rule states in pertinent part:

> Except as otherwise provided in this rule, evidence of the
> following is not, in any civil or criminal proceeding, admissible

6

against the defendant who made the plea or was a participant in the plea discussions:

   (1) a guilty plea that was later withdrawn;

   (2) a plea of nolo contendere plea;

   (3) a statement made during a proceeding on either of those pleas under Federal Rule of Criminal Procedure 11 or a comparable state procedure; or

   *(4) a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later-withdrawn guilty plea.*

Fed. R. Evid. 410 (emphasis added). However, defendants may waive Rule 410 objections, "absent evidence that a waiver is unknowing or involuntary." *United States v. Fifer*, 206 F. App'x 502, 509 (6th Cir. 2006); *see also United States v. Mezzanatto,* 513 U.S. 196, 205 (1995) (holding that Rule 410 creates "'a privilege of the defendant,' and, like other evidentiary privileges, [it] may be waived or varied at the defendant's request.").

The waiver provision at issue here, permitted the Government to use Shannon's proffer statements "to rebut any evidence offered by [Shannon] that [was] inconsistent with the statements made during [the proffer session]." (R. 496-2, Proffer Agreement, Pg ID 2149). Shannon does not challenge the validity of the proffer agreement; instead, he urges this Court to find that he did not violate the provisions of the agreement because he did not "offer evidence" by cross-examining Akhtar. Shannon contends that his cross-examination of Akhtar was simply a rebuttal of the Government's direct questioning and was aimed at establishing Akhtar's lack of first-hand knowledge about payments to beneficiaries. We find Shannon's arguments unpersuasive. While Shannon relies heavily on this argument, guidance from our sister circuits' precedent is more compelling.

7

In *United States v. Krilich*, 159 F.3d 1020 (7th Cir. 1998), the defendant contended that the waiver provision in his proffer agreement was limited to evidence presented through his own witnesses, not evidence obtained by cross-examination of the prosecution's witnesses. 159 F.3d at 1025. The waiver provision stated:

> [S]hould [defendant] subsequently testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer, nothing shall prevent the government from using the substance of the proffer at sentencing for any purpose, at trial for impeachment or in rebuttal testimony, or in a prosecution for perjury.

*Id.* at 1024. The Seventh Circuit rejected this argument finding that "[e]vidence is evidence, whether it comes out on direct or cross-examination." *Id.* at 1025. It opined that "[o]ne can 'otherwise present' a position through arguments of counsel alone, so it is very easy to see how a position can be 'presented' by evidence developed on cross-examination and elaborated by counsel." *Id.* The court concluded that "[i]ntroduction of the [proffer] statements [] was proper if either [the defendant's] testimony, or *evidence that he presented through the testimony of others*, contradicted the proffer." *Id.* (internal citations omitted) (emphasis added).

In *Barrow*, 400 F.3d 109, the defendant challenged the district court's finding that his counsel's trial conduct triggered the waiver clause of his proffer agreement. The waiver provision permitted the government to use the defendant's proffer statements "'to rebut any evidence offered or elicited, or factual assertions made, by or on behalf of [him] at any stage of a criminal prosecution.'" *Id.* at 116. The defendant contended that only a "specific or direct contradiction between his proffer statement and an assertion by counsel" would trigger the waiver clause. *Id.* at 117. The Second Circuit disagreed, determining that the waiver's use of the words "any evidence" created an expansive waiver, and applied to all evidence, whether "offered directly or *elicited on cross-examination*." *Id.* at 118 (emphasis added). Finally, in

*United States v. Hardwick*, 544 F.3d 565 (3d Cir. 2008), the defendant's proffer agreement provided that the government could "rebut *any* evidence or arguments offered on [the defendant's] behalf." 544 F.3d at 570. The Third Circuit determined that the "testimony *elicited* from [] witnesses on *cross-examination* was aimed at inferring that [others], rather than [the defendant], were responsible for the murders [], contrary to the statements [defendant] made under the proffer agreement." *Id.* at 571 (emphasis added).

Relying on these cases, we agree with the district court that Shannon did offer evidence when he elicited testimony from Akhtar on cross-examination. Shannon's argument that he did not offer any evidence because he did not call any witnesses or put on a defense case is unconvincing. Evidence is defined as "something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact." *Black's Law Dictionary* (10th ed. 2014). A party does not offer evidence only by calling its own witnesses or putting on its own case. Indeed, as noted by the *Krilich* court, evidence may be offered through cross-examination. *Krilich*, 159 F.3d at 1025. And as is consistent with the *Barrow* court's determination, because Shannon's waiver provision allowed the government to rebut "any evidence," this included evidence offered on direct or elicited on cross-examination. Thus, we reject Shannon's argument and conclude that the elicitation of testimony from Akhtar on cross-examination amounted to an "offer of evidence" under the terms of the proffer agreement.

Shannon contends that reliance on these cases is misplaced because the waiver provision at issue in each of these cases was broader than the waiver provision in the instance case. Shannon argues that the waiver provisions are distinguishable because an "offer of evidence" does not equate to an "argument" as used in *Hardwick*; a "position" as used in *Krilich*; or

"elicited evidence" as used in *Barrow*. Shannon's argument is unavailing. While the waivers are not identical, they need not be. All three cases support the general rule that cross-examination of a witness can amount to an "offer of evidence."

### 2. *Triggering the Waiver Provision*

Having determined that Shannon did offer evidence when he cross-examined Akhtar, we must now consider whether this evidence was inconsistent with Shannon's proffer and triggered the waiver provision. Because this is an evidentiary ruling, we review the district's court decision to admit Shannon's proffer statement for abuse of discretion. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010). We will not reverse unless an error affects a "substantial right"—that is, if the error had a "substantial and injurious effect or influence" on the jury's verdict. *Id.* (citation omitted). "[A]n erroneous admission of evidence that does not affect the 'substantial rights' of a party is considered harmless, and should be disregarded." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citation omitted).

Shannon asserts that his cross-examination was aimed at challenging the accuracy and credibility of Akhtar's testimony. He claims that defense counsel was merely responding to the testimony elicited by the Government from Akhtar and establishing that Akhtar did not have first-hand knowledge about the payments to beneficiaries. The district court, however, concluded that defense counsel's cross-examination "went too far" and was "problematic." We agree.

While Shannon certainly has the constitutional right to confront and question the witnesses against him, *see* U.S. Const. amend. VI, "[i]mpeachment of a witness need not be 'contrary to' or 'inconsistent with' a defendant's admission of guilt in a bargaining proffer." *Krilich*, 159 F.3d at 1025. "Statements are inconsistent only if the truth of one implies the falsity

10

of the other." *Id.* at 1025-26. In *Hardwick,* the court rejected the defendant's contention that his questioning on cross-examination was "intended only to impeach the credibility of the Government's cooperating witnesses and to challenge their recollections of certain events." *Hardwick,* 544 F.3d at 571. The court found no error in the district court's determination that the defendant also attempted to challenge his role in the crimes, contrary to his proffer statements. *Id.* Accordingly, the court found that the district court did not abuse its discretion in admitting the defendant's proffer statements. *Id.*

Similarly, we find that the testimony elicited from Akhtar was not only aimed at questioning his credibility and accuracy, but also at inferring that Shannon did not pay beneficiaries, an inference that is inconsistent with his proffer statements. A review of the trial transcript shows that, Shannon's counsel elicited from Akhtar the admission that Akhtar lacked first-hand knowledge about the payments:

> Q [Defense Counsel]: . . . [Y]ou indicated on direct examination that you had knowledge of Mr. Shannon paying patients. You remember that testimony?
> A [Akhtar]: Yes, sir.
> Q [Defense Counsel]: Okay. And that's not firsthand knowledge, correct? You didn't see Mr.—Mr. Shannon paying any patients, correct?
> A [Akhtar]: No, sir.

(R. 623, Trial Transcript, Pg ID 3801-02). But Shannon's counsel did not stop there. Subsequent questioning was aimed at eliciting testimony from Akhtar that was inconsistent with Shannon's proffer—that he did, in fact, pay beneficiaries. Shannon's counsel attempted to create the inference that Shannon did not pay beneficiaries at all because some of the beneficiaries called Akhtar to complain that Shannon had not paid them:

11

| Q [Defense Counsel]: | That was just the rumor going around in the office, correct? |
| A [Akhtar]: | No. |
| Q [Defense Counsel]: | That wasn't a rumor? |
| A [Akhtar]: | It was not a rumor if patient is calling and asking that Shannon had me sign the paperwork and did not give me the money he promised. |
| Q [Defense Counsel]: | *Okay. Well, if he didn't give him the money that he promised, that means he didn't pay them, correct?* |
| A [Akhtar]: | That's why patient was calling, to get the money. |
| Q [Defense Counsel]: | Okay. I understand that's why they were calling, *but they weren't paid, correct?* |
| A [Akhtar]: | At that time, yes. |

(*Id.* at 3802) (emphasis added). Counsel's questions about the payments were not confined to temporal proximity (i.e., that means he didn't pay them *at that time*, correct?); rather, the questioning shows that counsel was attempting to negate the fact that Shannon had ever paid beneficiaries—in contradiction to his proffer. Thus, per the waiver provision, the Government was free to rebut this evidence by introducing Shannon's proffer statements. We find that the district court did not abuse its discretion in so concluding.

Shannon also contends that the admission of his proffer statements affected his substantial rights and denied him a fair trial because the "central theme of [his] defense was to challenge his knowledge and culpability of the offenses." Appellant Br. at 26. Shannon claims that the Government offered little proof that he knew about and intended to participate in the conspiracy, but then "trumpeted" Shannon's proffer statements in its closing as evidence of Shannon's guilt. *See* Appellant Br. at 26-27. Having determined that the district court did not err in admitting Shannon's proffer statements, we reject this argument. As explained above, it was not an abuse of discretion for the district court to conclude that Shannon triggered the waiver

provision of his proffer agreement, thereby allowing the Government to use his proffer statements to rebut the inconsistent evidence that he offered. Shannon, with counsel present, freely stipulated to the conditional use of his statements by signing the proffer agreement, and he has not argued that this waiver was made unknowingly or involuntarily.

Accordingly, we conclude that Shannon did offer evidence when he cross-examined Akhtar, and that this testimonial evidence was inconsistent with his proffer. Consequently, the district court did not abuse its discretion in admitting Shannon's proffer statements into evidence.

### B. Sentencing

Shannon also argues that his sentence was procedurally unreasonable. Shannon bases his argument on two assignments of error: (1) that the district court failed to comply with Federal Rule of Criminal Procedure 32 when it ruled on Shannon's objection to the fraud loss calculation; and (2) that the district court erroneously relied on the Government's relevant conduct evidence in determining fraud.

We review sentences under a deferential abuse-of-discretion standard. *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). A court will be deemed to have imposed a procedurally unreasonable sentence if it "failed to calculate the Guidelines range properly; treated the Guidelines as mandatory; failed to consider the factors prescribed at 18 U.S.C. § 3553(a); based the sentence on clearly erroneous facts; or failed to adequately explain the sentence." *United States v. Coppenger*, 775 F.3d 799, 803 (6th Cir. 2015) (citations omitted). For purposes of sentencing enhancements under the Guidelines, we review the district court's method of calculating loss *de novo*. *United States v. White*, 492 F.3d 380, 414 (6th Cir. 2007). Findings of fact underlying the district court's loss calculations, however, are reviewed for clear error. *Id.* "A finding that the calculations were clearly erroneous will follow only if this Court

'on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Ware,* 282 F.3d 902, 907 (6th Cir. 2002)).

In its Sentencing Memorandum and during sentencing, the Government contended that Shannon had actually profited $186,775.00, contrary to the $55,350.00 it asserted and proved at trial. The Government contends that it is a well-established principle that a sentencing court may consider relevant conduct in estimating a loss amount. Thus, the Government asserts, during the sentencing phase, it was free to introduce, and the district court was free to consider, evidence of Shannon's relevant conduct. During the sentencing phase, the Government introduced evidence that Shannon received additional money recruiting for other Shahab-related health care agencies and Acure—a Shahab-affiliated health care agency. In the separate prosecution of Acure's owner, the Government introduced a chart purporting to show that, in addition to the $55,350.00 Shannon made recruiting for All American and Patient First, he also made $120,975.00 recruiting for Acure and $10,450.00 recruiting for the other Shahab-related entities. During Shannon's sentencing phase, the Government re-submitted this same chart with its Sentencing Memorandum and referred to it during sentencing. The Government never sought to introduce this chart during Shannon's trial.

Under § 1B1.3 of the Sentencing Guidelines, "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996) (citing U.S.S.G. § 1B1.3, background). This "relevant conduct" may be considered if it is "part of the same course of conduct or common scheme or plan as the offense of conviction." *Hill*, 79 F.3d at 1481 (citing U.S.S.G. § 1B1.3(a)(2)). "To qualify as part of a 'common scheme or plan' under the 'relevant conduct' guideline, the offenses 'must be substantially connected to each other by

14

at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*'" *Hill*, 79 F.3d at 1481 (citing U.S.S.G. § 1B1.3, application note 9(A)). Relevant conduct is not limited to conduct for which the defendant has been convicted. *United States v. Maken*, 510 F.3d 654, 658 (6th Cir. 2007).

As an initial matter, Shannon contends that admission of the Government's relevant conduct evidence was error because the evidence was not a part of the record and the Government submitted the evidence at sentencing without any foundation. Shannon asserted at sentencing that some "minimum concern of due process" needed to be met before the Government would be allowed to introduce the evidence. (R. 705, Sentencing Transcript, Pg ID 6844). But Shannon's argument disregards our precedent that sentencing judges may engage in judicial fact-finding and consider evidence under a preponderance of the evidence standard. *United States v. Moncivais*, 492 F.3d 652, 665 (6th Cir. 2007) (quoting *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006) ("[W]e find that judicial fact-finding in sentencing proceedings using a preponderance of the evidence standard. . . does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury."). Accordingly, consideration of relevant conduct evidence during sentencing does not violate a defendant's due process rights.

However, failure to actually find facts by a preponderance of the evidence on contested matters during sentencing is error. Federal Rule of Criminal Procedure 32(i)(3)(B) requires the district court to rule on "any disputed portion of the presentence report or other controverted matter," at sentencing. *White*, 492 F.3d at 415 (quoting Fed. R. Crim. P. 32(i)(3)(B)). In *White*, we stated that the "'court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the

evidence.'" *Id.* (internal citation omitted). Rather, once the defendant raises a dispute regarding the presentence report during sentencing, the district court must "*actually find facts*, and it must do so by a preponderance of the evidence." *Id.* at 416 (emphasis in original). And we reiterated that "literal compliance" with Rule 32 is required "'for a variety of reasons, such as enhancing the accuracy of the sentence and the clarity of the record.'" *Id.* at 415. Furthermore, "[w]hen a defendant raises a particular[, nonfrivolous] argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it." *Wallace*, 597 F.3d at 803 (internal quotation marks omitted).

Shannon objected to the Government's fraud loss calculation during sentencing, arguing that the Government failed to submit any evidence at trial that he profited in the amount of $186,775.00. The Government countered that the "fraud loss. . . [was] tied directly to the amount of payments that were paid to Mr. Shannon directly or to his company. . . ," and that "[t]he Court need only make a reasonable estimate of loss." (R. 705, Sentencing Transcript, Pg ID 6841). The Government further asserted that the additional profit was a part of Shannon's relevant conduct and that the district court was free to consider the additional amount that Shannon allegedly gained. In response to Shannon's objection and the Government's explanation, the district court stated:

> Okay. I'm satisfied that the amount of loss calculated by the Government of 1.6 million dollars in false payments by Medicare is the amount of loss that the Court should consider in this particular case based upon the $186,775 and the $4,500 per home health care episode, and the Court so finds.

(R. 705, Sentencing Transcript, Pg ID 6845). We agree with Shannon that the district court erred in failing to comply with Federal Rule of Criminal Procedure 32(i)(3)(B).

Once Shannon objected to the Government's fraud loss calculation, the district court was required to explain its factual findings for determining that Shannon would be held accountable for the fraud loss amount. The district court not only failed to make any factual findings for this amount, but failed to do so by a preponderance of the evidence. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006) ("Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence…"). Indeed, the district court failed to even state whether it accepted the Government's relevant conduct evidence. While consideration of relevant conduct evidence may have been appropriate in this case, we make no determination as to its weight. We conclude only that the district court did not satisfy Rule 32 in determining Shannon's fraud loss. Thus, although the district court may have properly relied on the Government's relevant conduct evidence, it did not articulate, on the record, its factual findings proved by a preponderance of the evidence, for attributing the $186,775.00 amount to Shannon. Accordingly, we must remand the case to the district court for resentencing. *See United States v. Orlando*, 281 F.3d 586, 601 (6th Cir. 2002) ("Although the evidence may justify holding [defendant] accountable for $449,000 of laundered money, the district court's failure to explain its factual determination requires us to remand the case for his resentencing.").

## III.    CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's admission of Shannon's proffer statement. However, we **VACATE** Shannon's sentence and **REMAND** for resentencing.