**NOT RECOMMENDED FOR PUBLICATION**

File Name: 21a0009n.06

Case No. 19-2278

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Jan 06, 2021

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| DEMARIO M. PETERSON, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE: SUHRHEINRICH, McKEAGUE, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** Following a three-day trial, a jury convicted Demario Marcellis Peterson of various drug and firearms crimes. The district court sentenced Peterson to 420 months imprisonment. On appeal, Peterson challenges the magistrate judge's factual findings in approving a search warrant, the jury's conclusion that Peterson was guilty of the bulk of the charges against him, and the sentence imposed by the district court. The underlying record coupled with the deferential standards governing our review, however, lead us to affirm the judgment.

### BACKGROUND

Mother's Day 2017 ended tragically for one young mother named Madison. (For privacy reasons, only Madison's first name has been used in these proceedings.). Madison had battled a

heroin addiction for many years. Two days before the holiday weekend, Madison and her boyfriend (and her child's father), Kevin Kellahan, were on the hunt for their latest fix. Their search brought them to Jackson, Michigan, where the pair obtained escalating amounts of heroin from various dealers. The couple eventually returned home and fell asleep around midnight. Madison woke early the next morning to again inject herself with heroin. When Kellahan awoke hours later, he found Madison nearly lifeless, struggling to breathe. Paramedics rushed her to the hospital where she persisted in a vegetative state before passing away on Mother's Day. Toxicology tests revealed that Madison died of a fentanyl overdose, likely combined with the heroin she had used.

Officers interviewed Kellahan. He disclosed that the couple's main heroin source was "Moe," a dealer they had bought from many times before. Kellahan told police that Madison arranged for the buy from an individual listed in her phone as "Moe's New Number," with the buy facilitated by one of Moe's runners. Using this number, officers arranged for a controlled drug purchase whereby Kellahan would seek to purchase from Moe's runner $50 worth of heroin.

The undercover buy worked as planned. Jamaris Payne, who Kellahan confirmed as the runner for the fatal supply, greeted Kellahan with a baggie of a heroin/fentanyl mixture. Following his arrest, Payne disclosed that his supplier, Peterson, was in fact "Moe." Payne further explained that Peterson operated out of an apartment at 4524 Westbrook Drive. When officers began surveilling the apartment, they witnessed short-term traffic consistent with drug-trafficking activity. Using this information as well as the fact that Peterson's number was associated with another overdose death in the area, officers obtained and executed a search warrant of the apartment.

The search and subsequent investigations revealed Peterson's role at the forefront of an extensive drug-trafficking operation. In the apartment, officers discovered thousands of dollars in cash, $40,000 worth of heroin and crack cocaine, two firearms, and a swath of drug-trafficking paraphernalia, such as scales, sale-size baggies identical to the one in Payne's possession during the controlled buy, and hide-a-cans. Officers later learned that Peterson also stashed drugs at other locations. And through Peterson's social media accounts, officers learned that he was not shy about his work—Peterson proudly bestowed upon himself the nickname "pusher man," posting photographs of himself and his children with firearms and stacks of cash. A grand jury later indicted Payne and Peterson for violating various federal drug and weapons laws, including distributing the fentanyl that resulted in Madison's death. Payne pleaded guilty to two charges, while Peterson proceeded to trial.

Trying Peterson, however, was no easy feat. Peterson repeatedly disrupted pre-trial proceedings. And the trial itself ended in a mistrial when a juror refused to continue deliberations. During the second trial, recent dental work forced Payne to testify with his jaw wired shut. Parts of his testimony were difficult to understand, resulting in 41 "indiscernible" transcriptions by the court reporter. Through his testimony, Payne confirmed that Peterson was his source for narcotics, and that Payne was part of a larger "crew" that would receive drugs from Peterson for sale. Payne also testified as to his and Peterson's involvement in Madison's overdose. Jurors heard from Kellahan, who recounted the events leading to Madison's death and the couple's prior interactions with Peterson. In addition, various state and federal officers testified as to the results of their investigation of Peterson, including what was found in Westbrook as well as in Peterson's other stash houses. Ultimately, the jury acquitted Peterson of the death-results charge, but convicted

3

him on all other counts, including conspiring to distribute heroin, possessing heroin and cocaine, maintaining a drug premises, and possessing a firearm in furtherance of a drug-trafficking crime.

At sentencing, the district court imposed several enhancements when calculating the Guidelines range, including ones for managing a drug-trafficking operation and obstruction of justice. Collectively, the enhancements together with Peterson's criminal history and a mandatory minimum resulted in a Guidelines range of 248 to 295 months. The district court then granted the government's motion for an upward variance in accordance with 18 U.S.C. § 3553(a), sentencing Peterson to 420 months' imprisonment. Peterson's timely appealed followed.

## ANALYSIS

*Motion to Suppress Evidence.* Peterson first argues that the affidavit used to support the warrant to search Westbrook lacked probable cause sufficient to satisfy the Fourth Amendment. "Probable cause 'is not a high bar.'" *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). It exists when an affidavit shows a "fair probability" that criminal evidence will be found in the place to be searched. *See United States v. Hines*, 885 F.3d 919, 923 (6th Cir. 2018) (quoting *United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009)). On review, we pay great deference to the issuing judge, *see United States v. McLevain*, 310 F.3d 434, 439 (6th Cir. 2002), and ask only whether the judge had a "substantial basis" for finding probable cause, *see Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation omitted).

The affidavit relied on here passes constitutional muster. It detailed officers' investigation of Madison's death, noting everything from Kellahan's revelations about his past purchases from Peterson and the recent purchase from Payne to the controlled buy with Payne and Payne's disclosures about Peterson's use of Westbrook for drug-trafficking activity. Additional evidence independently corroborated these disclosures. For instance, Peterson, through his phone number,

4

was associated with another overdose case from the prior year. And based on a March arrest, a police database showed that Peterson resided at Westbrook, a fair indicator that evidence of drug trafficking might exist there. *See United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) ("[I]n the case of drug dealers, evidence is likely to be found where the dealers live." (citation omitted)). Finally, officer surveillance corroborated Payne's description of the house and showed short-term visits consistent with drug-trafficking activity. Adding all of this together, the warrant application demonstrated a fair probability that evidence of Peterson's drug trafficking would exist at Westbrook.

Peterson resists this conclusion on several fronts. He first maintains that the information relied on in the affidavit did not concern a "presently existing condition," rendering it stale. *See United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (citations omitted). He takes particular umbrage at Payne's assertion that he observed heroin at Westbrook "on a prior occasion." But even if that statement is a stale one, including that evidence in a warrant affidavit is not fatal when, as here, recent information corroborates the stale information. *See United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010). Two witnesses told officers that Peterson was actively involved in trafficking heroin in the days and weeks before the warrant issued. Peterson too had identified Westbrook as his residence less than two months before officers searched the apartment. And officers witnessed short-term traffic from Westbrook consistent with drug trafficking just prior to securing the warrant. Today's case is thus unlike *United States v. Hython*, 443 F.3d 480, 483–85 (6th Cir. 2006), where the warrant at issue was supported only by an anonymous tip that drugs were purchased at an unknown time at the place to be searched.

Beyond staleness concerns, Peterson questions Payne's reliability as well as the evidence used to corroborate Payne's statements to the police. Peterson would require robust corroboration

of those statements. But we set that high bar only in the context of warrants based on anonymous tips or confidential informants. *See, e.g.*, *United States v. Neal*, 577 F. App'x 434, 441 (6th Cir. 2014); *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006). "[N]amed informants," on the other hand, "require little corroboration." *United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008). Their statements are "generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." *United States v. Hodge*, 714 F.3d 380, 384–85 (6th Cir. 2013).

Even if corroboration was needed, it existed here. Consistent with Kellahan's statements to officers, Payne's disclosures that the drug dealer, "Moe," was in fact Peterson, who resided at Westbrook, were confirmed by (1) searches of police databases, (2) a separate overdose incident linked to Peterson, and (3) officer surveillance. Perhaps short-term traffic at Westbrook alone would not justify a search of the location. But we do not consider an affidavit in a "hypertechnical" or "line-by-line" manner. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting *Gates*, 462 U.S. at 236, 246 n.14). Rather, we assess the totality of the circumstances presented to the magistrate. *Gates*, 462 U.S. at 230–31. And here, those circumstances established a fair probability that drug trafficking evidence would be found at Westbrook. Contrary to Peterson's suggestion, his case is a far cry from *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009), where an informant's statements concerning the source of his drugs lacked any independent corroboration, or *United States v. Buffer*, 529 F. App'x 482, 485 (6th Cir. 2013), where the sole corroboration for an anonymous tip was vague officer observations about "several" visits being made to a residence.

Lastly, Peterson contends that his status as a drug dealer alone provides an insufficient nexus between the place being searched and the evidence sought. But Payne's observation of prior

drug activity at Westbrook, when viewed in light of the totality of the circumstances, provides that nexus. And a sufficient nexus can exist between a defendant's residence and illegal drug activity even with "no facts indicating that the defendant was dealing drugs from his residence." *See United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018). For instance, where, as alleged in the affidavit, Peterson was engaging in regular and repeated drug sales, it is "reasonable to infer that evidence of illegal activity would be found at [his] residence." *See United States v. Gunter*, 551 F.3d 472, 481 (6th Cir. 2009). And a nexus can exist between drug activity and a defendant's residence where the defendant had a past history with drug activity coupled with recent surveillance activity. *See United States v. Miggins*, 302 F.3d 384, 389, 393–94 (6th Cir. 2002). In short, given the low bar of probable cause, the affidavit contained sufficient facts to authorize the search of Westbrook.

*Motion for the Mistrial.* Peterson next argues that the district court should have declared a mistrial based on the difficulties in understanding Payne's testimony. We defer to the district court's assessment that a mistrial was unwarranted unless the testimony was manifestly unfair to Peterson. *United States v. Wiggins*, 784 F. App'x 919, 923 (6th Cir. 2019); *United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010).

Oddly enough, Peterson contends that difficulties in understanding a key *government* witness prejudiced *his defense*. The record does not support this counterintuitive contention. Although the transcript reveals that some specific phrases Payne uttered during his testimony were difficult to understand, attorneys, the court reporter, and the court itself all obtained clarifications as needed. According to the district court, after some initial difficulties, Payne's testimony became "very, very easy to understand." The two specific instances Peterson highlights as grounds for a mistrial were either immediately clarified through follow-up questioning or were deemed so

inconsequential by the defense as to warrant no further clarification. Although Peterson posits that jurors might have thought he caused Payne's injuries, thereby prejudicing his trial rights, this purely speculative argument was not raised below and fails on plain-error review. *See United States v. Deitz*, 577 F.3d 672, 690 (6th Cir. 2009).

*Sufficiency of the Evidence.* Peterson next attacks the sufficiency of the evidence used to convict him. For this claim, Peterson bears a "heavy burden," as we defer to the factual findings of the jury and reverse a conviction only where the evidence, viewed in a light most favorable to the government, cannot support the verdict. *See United States v. Bailey*, 973 F.3d 548, 564 (6th Cir. 2020) (citation omitted). Peterson cannot shoulder this burden.

With regard to the conspiracy charge under 21 U.S.C. § 846, ample evidence supported the conclusion that Peterson knew of, intentionally joined, and participated in an agreement to violate federal narcotics laws. *See United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010) (listing elements of a § 846 violation). Payne testified to Peterson's key role in the conspiracy. Specifically, he told jurors that Peterson trafficked in heroin and cocaine, directing his crew to sell drugs from his various stash houses. Although Peterson contends that Payne was simply lying, credibility determinations are inappropriate in reviewing a sufficiency of the evidence claim. *See United States v. Ward*, 957 F.3d 691, 695–96 (6th Cir. 2020).

Other evidence further supported the conspiracy charge. For instance, Kellahan testified that Peterson was a drug dealer who managed several runners. And jurors learned about false-bottom cans and distinctive Ziplock baggies found both on Payne during his arrest and at Peterson's residence. There were also phone records corroborating Peterson's role at the forefront of the conspiracy, including messages from Payne and Madison regarding drug trafficking.

8

Much the same is true as to Peterson's challenges to his convictions related to the drugs and guns found at Westbrook. To convict Peterson of illegally possessing an item, the government need only prove that he had dominion and control over the item, *see United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009), for instance, by showing that the contraband was found in Peterson's residence or personal living space, *see United States v. Malone*, 308 F. App'x 949, 952–53 (6th Cir. 2009) (collecting cases). Here, Peterson listed Westbrook as his place of residence during an earlier arrest. He was receiving mail at Westbrook and even took out an automobile insurance policy associated with that address. In addition, Peterson's clothing was found at Westbrook in close proximity to contraband. All of this physical evidence corroborated Payne's testimony that Peterson lived at Westbrook and used it to store guns and drugs. As such, a rational jury could conclude that Peterson constructively possessed the drugs and guns found at Westbrook.

*Sentencing Challenges*. Peterson's remaining arguments concern the trial court's sentence of 420 months that resulted from his convictions on the conspiracy and drug- and firearm-possession charges. A theme throughout those arguments is Peterson's attack on the district court's decision to vary upward based (in part) on a finding that Peterson had a role in Madison's death, an allegation for which the jury acquitted him.

1. *Constitutional Challenge.* Peterson maintains that the district court violated the Fifth and Sixth Amendments by relying on acquitted conduct during sentencing. To be sure, the Constitution does require that a jury find beyond a reasonable doubt the facts that affect the range of sentences to which a defendant is exposed. *See Alleyne v. United States*, 570 U.S. 99, 108 (2013). But a judge may "exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000). Doing so, in fact, is a "long-standing

9

sentencing practice." *United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) (Kavanaugh, J.); *see also United States v. Donelson*, 695 F.2d 583, 590 (D.C. Cir. 1982) (Scalia, J.) ("It is well established that a sentencing judge may take into account facts introduced at trial relating to other charges, even ones of which the defendant has been acquitted."). That is what happened here. Peterson was convicted of at least one count that carried a maximum term (40 years) that exceeded his actual sentence (420 months). *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B). The district court did not "abridge [Peterson's] right to a jury trial by looking to . . . acquitted conduct" in "selecting a sentence" within the statutory range envisioned by the jury verdict. *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc); *cf. United States v. Watts*, 519 U.S. 148, 156–57 (1997) (per curiam) (concluding that neither the Sentencing Reform Act nor the Double Jeopardy Clause "prevent the sentencing court from considering conduct underlying the acquitted charge").

True, as Peterson notes, *White* involved the use of acquitted conduct as a basis for an offense level enhancement under the Guidelines, as opposed to an upward variance. But as we acknowledged there, *United States v. Booker*, 543 U.S. 220, 245 (2005), made the Sentencing Guidelines non-binding, "freeing a district court to impose a non-guidelines sentence" so long as the sentence fit within the statutory sentencing range resulting from the jury verdict. *White*, 551 F.3d at 385. As a result, the distinction between relying on acquitted conduct as the basis for a Guidelines enhancement versus an upward variance is a distinction without a difference, so long as the sentence is within the statutory sentence range set by the jury's findings.

*United States v. Haymond*, 139 S. Ct. 2369 (2019), does not say otherwise. *Haymond* invalidated an application of 18 U.S.C. § 3583(k) because the statute allowed for a judge to impose an *additional* sentence beyond the prison term that resulted from the jury's verdict based solely on the judge's own findings. *See* 139 S. Ct. at 2378 (plurality opinion); *id.* at 2386 (Breyer, J.,

concurring). As Peterson's sentence was within the range envisioned by the jury, the constitutional error recognized in *Haymond* is not present here.

Much the same is true for *United States v. Rebmann*, 226 F.3d 521 (6th Cir. 2000). On the facts there, we held that the Due Process Clause required a finding of proof beyond a reasonable doubt for a court to impose a death-results sentence enhancement that would increase the maximum penalty to which the defendant was exposed. *Id.* at 524–25. Rebmann pleaded guilty only to a bare violation of 21 U.S.C. § 841(a)(1). *Id.* at 522. But because she did not waive her right to have the government prove the statutory penalty enhancement beyond a reasonable doubt, we found error in the district court applying the enhancement based on a preponderance of the evidence. *Id.* at 524. Here, on the other hand, the district court considered Peterson's acquitted conduct in imposing a sentence for crimes that the jury concluded Peterson committed beyond a reasonable doubt. The peculiar procedural posture of *Rebmann* is thus not implicated here. *Cf. United States v. Robinson*, 732 F. App'x 405, 408–09 (6th Cir. 2018) (declining to extend *Rebmann* when a court enhanced the Guidelines ranges based on a death-results finding).

2. *Reasonableness of the Sentence.* Beyond his constitutional arguments, Peterson argues that his sentence was otherwise unreasonable. Criminal sentences must be both procedurally and substantively reasonable, a question we review under the deferential abuse-of-discretion standard. *United States v. Alexander*, 543 F.3d 819, 821–22 (6th Cir. 2008) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). A sentence is procedurally unreasonable if the district court improperly calculates the Guidelines range, fails to consider the 18 U.S.C. § 3553(a) factors, or fails to adequately explain the chosen sentence. *Gall*, 552 U.S. at 51. In contrast, a substantive challenge focuses on the length of the sentence itself, *see United States v. Clayton*, 937 F.3d 630, 643 (6th

Cir. 2019), including how the court weighed the § 3553(a) factors, *see United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

a. *Procedural Reasonableness.* Peterson lodges several procedural challenges to his sentence, the first of which is an extension of his constitutional claim. Peterson maintains that the sentencing judge did not adequately explain why he was in "disagree[ment] with a jury's verdict and . . . punishing a defendant for acquitted conduct." But there are a number of shortcomings with Peterson's argument, beginning with his assertion that the sentencing judge "disagreed" with the jury. True, as the jury verdict reflected, the prosecution did not prove the elements of the death-results crime beyond a reasonable doubt. But Peterson's sentence was premised on findings based on a preponderance of evidence—a distinct burden of proof. *See White*, 551 F.3d at 385; *see also Watts*, 519 U.S. at 157.

The upward variance, moreover, was not premised solely on a finding that Peterson caused Madison's death. Rather, the sentence was a product of the district court's consideration of the § 3553(a) factors, including their application to issues beyond the specific incident with Madison. Much of Peterson's sentencing was premised on what the district court viewed as Peterson's lack of remorse in peddling heroin laced with fentanyl, which affected the "safety of all persons within [the] community." And any argument that his ultimate sentence was unreasonable goes to its *substance*; it does not address whether the sentencing judge properly engaged in the *process* of explaining how he arrived at his sentence through his weighing of the § 3553(a) factors. *See Rayyan*, 885 F.3d at 442.

Regardless, the sentencing judge adequately explained that Peterson had a role in Madison's death, observing that the weight of the record, including Payne's testimony, credibly supported Peterson's involvement in providing the lethal batch to Madison. Because the district

court explained "why the [acquitted] conduct influenced its decision," the sentence imposed satisfied procedural reasonableness. *See United States v. Nesbit*, 350 F. App'x 984, 986 (6th Cir. 2009). Perhaps, as Peterson notes, the district court did not specifically engage with every piece of potentially exculpatory evidence. But the district court need not exhaustively discuss every argument where, as here, the record confirms that the court provided due consideration as to the basis for Peterson's sentence. *See Rita v. United States*, 551 U.S. 338, 359 (2007).

Peterson's remaining arguments on procedural reasonableness concern alleged factual errors in calculating Guidelines enhancements for (1) leading a criminal enterprise of at least five or more individuals; and (2) obstructing justice, as that phrase is used in the Guidelines, through a Facebook post. We will reverse the district court's findings only where we find clear error. *See United States v. Shannon*, 803 F.3d 778, 787 (6th Cir. 2015).

As to the leadership enhancement, sufficient evidence supports the district court's findings. Payne's interview with officers specified the names of four additional runners who worked for Peterson. While Payne may have equivocated in later testimony, Payne's original interview coupled with the vast circumstantial evidence concerning the size of Peterson's operation suffices to support the enhancement. *See United States v. Wheaton*, 517 F.3d 350, 369 (6th Cir. 2008) (requiring reversal for a Guidelines enhancement finding only if there is a "definite and firm conviction that a mistake has been committed" (citation omitted)).

The record likewise supports the obstruction enhancement. Peterson declared on Facebook that an unidentified "he" formerly had been "talk[ing] too much on the streets" and now was "talking to detectives and prosecutors." Context is king in determining whether a comment is sufficiently "threatening" to warrant application of U.S.S.G. § 2D1.1(b)(16)(D). For instance, in *United States v. Kamper*, 748 F.3d 728, 744–45 (6th Cir. 2014), we affirmed the enhancement's

application when a defendant referred to a cooperating witness as a "rat" and a "snitch" in conversations with fellow inmates, knowing that it could lead to harm to the witness. Here, Peterson made his Facebook post while evading law enforcement, with the understanding that Payne was cooperating with law enforcement and that those who read the post would respond negatively to Payne's cooperation. In that context, Payne's social media post is tantamount to the whispered jail house statement in *Kamper.*

Even if the district court erred in applying the enhancements, those errors are harmless when the court makes clear "that it would have imposed the same sentence even if it had not adopted the enhancement[s] that a defendant wants to challenge on appeal." *United States v. Collins*, 800 F. App'x 361, 362 (6th Cir. 2020); *see also United States v. Susany*, 893 F.3d 364, 368 (6th Cir. 2018). Having applied the purportedly erroneous enhancements, the district court still concluded that the upper end of that sentencing range was "not enough," and opted to vary upward to 420 months based on its assessment of the § 3553(a) factors. Put another way, had the district court begun from a lower range, it would have still found that range unsatisfactory and varied upward to the current sentence. In that respect, the sentence turned less on errors in calculating the Guidelines range and more on the lower court's assessment of the § 3553(a) factors, to which we now turn.

b. *Substantive Reasonableness.* As to the upward variance's substantive reasonableness, while the abuse-of-discretion standard remains, *United States v. Erpenbeck*, 532 F.3d 423, 440 (6th Cir. 2008), we must "consider the extent of the deviation and ensure that the justification is sufficiently compelling" to support the degree of variance, *Gall*, 552 U.S. at 50. "The farther the judge's sentence departs from the Guidelines sentence, the more compelling the justification based on factors in § 3553(a) must be." *United States v. Aleo*, 681 F.3d 290, 299 (6th Cir. 2012) (cleaned

up). In so doing, the district court must clearly distinguish the case before it from a "mine-run case." *United States v. Boucher*, 937 F.3d 702, 708 (6th Cir. 2019), *cert denied*, 140 S. Ct. 2668 (Apr. 20, 2020).

Here, the district court provided ample support for the variance. With respect to the § 3553(a) factors, the nature and circumstances of Peterson's offenses were more serious than the typical narcotics trafficking case. Physical evidence and multiple witnesses revealed that Peterson led a robust drug-trafficking operation, employing several runners to sell cocaine and heroin laced with fentanyl to the Jackson community. Indeed, Peterson bragged openly on social media about his success as a drug dealer, posing himself and his children with large stacks of money and calling himself "pusher man." And, as the district court observed, credible evidence—from Kellahan's and Payne's testimony concerning the source of the heroin that killed Madison to government witnesses testifying about the physical evidence tying Peterson to Madison's death—made it at least more likely than not that Peterson was not just distributing drugs, but "distributing drugs that kill people . . . ." R. 216, Tr. of Sentencing Hr'g, PageID# 2588.

Other § 3553(a) factors supported the upward variance. Start with Peterson's unique history and characteristics—namely, his lack of remorse and extreme greed. The district court observed that Peterson openly snickered at the court as it recounted how Peterson injected deadly and powerful narcotics into heroin that he distributed to vulnerable drug addicts. The sentence also reflected how an upward variance would promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from Peterson, who, in the view of the district court, demonstrated little respect for the law during the course of the trial and sentencing. In short, there was no abuse of discretion.

15

Returning to his constitutional themes, Peterson paints the district court as placing excessive weight on Peterson's "lack of remorse for something he was acquitted of" and that it "does not promote respect for the law" to "disregard[ ] the jury's verdict." But as before, our precedent permits reliance on acquitted conduct during sentencing. Doing so, moreover, does not disregard or disrespect the jury's verdict.

Finally, Peterson suggests there is insufficient support for the district court's findings that Peterson was the leader of a drug-trafficking operation and that his heroin was involved in Madison's death. Viewed in isolation, some evidence might mitigate Peterson's culpability. But viewed as a whole, the record shows it is more likely than not that Peterson's involvement in serious crimes warranted a sentence of 420 months. The district court, we note, was in the unique position of having twice heard trial testimony about Peterson, his narcotics dealings, and his involvement in Madison's death. Understandably, the district court's related findings are entitled to deference. *See United States v. Madden*, 515 F.3d 601, 613 (6th Cir. 2008); *see also Gall*, 552 U.S. at 51 (observing that district courts are uniquely positioned "to find facts and judge their import under § 3553(a)"). We see no basis to second guess those findings or the corresponding sentence.

## CONCLUSION

For the aforementioned reasons, we affirm the judgment of the district court.

16