# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1334

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

WILLARD JOHNSON,

*Defendant*,

and

H. WESLEY ROBINSON and NATIONAL
LEGAL PROFESSIONAL ASSOCIATES,

*Appellants*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 CR 30024—**G. Patrick Murphy**, *Chief Judge*.

ARGUED OCTOBER 30, 2002—DECIDED APRIL 24, 2003

Before FLAUM, *Chief Judge*, and BAUER and DIANE P. WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*.   Hugh Wesley Robinson and National Legal Professional Associates ("NLPA") appeal a district court order imposing monetary sanctions after the court determined that Robinson and NLPA (together, "Appellants") were engaged in the unauthorized practice of law in the Southern District of Illinois. For the reasons set forth below, we find that the district court properly

invoked its inherent power to investigate and sanction Appellants' conduct, but that it abused its discretion in directing that certain fees paid for Appellants' services be returned and disbursed to a charity of the district court's choosing.

**BACKGROUND**

Willard Johnson, the named defendant in this appeal, was represented by court-appointed counsel, Philip J. Kavanaugh III, during pretrial proceedings in the Southern District of Illinois for federal drug-trafficking charges. After Kavanaugh refused Johnson's request that Kavanaugh hire NLPA to assist him in the preparation of Johnson's defense, Johnson filed a complaint with the Attorney Registration and Disciplinary Commission of Illinois ("ARDC"). Consequently, Kavanaugh moved to withdraw as Johnson's counsel.

At all times relevant for purposes of this appeal, NLPA was an Ohio-based firm providing pretrial, sentencing, and post-conviction consulting services, and Robinson served as NLPA's Administrative Director and Director of Case Analysis and Research. In 1985, the Ohio Supreme Court permanently disbarred Robinson from the practice of law following a federal criminal conviction for mail fraud.[1] Robinson is not licensed to practice law in any other jurisdiction. In order to market its paralegal services, NLPA routinely provided criminal defendants with literature explaining those services and the method by which a defendant's legal counsel might hire NLPA. Since

---

[1] Robinson was sentenced to three years in prison and five years of probation for his role as the "mastermind" of a loan-placement scam that defrauded its victims of over $720,000 during a three-month period in 1980. *United States v. Robinson*, 774 F.2d 261 (8th Cir. 1985).

NLPA was not a law firm, nor was Robinson (nor any of NLPA's consultants under his direction) a licensed attorney, NLPA's services could comprise only part of the client's defense team under the supervision of a licensed attorney. Though NLPA marketed itself directly to criminal defendants as potential clients, and clients or their families bore sole responsibility for paying NLPA's fees, only a defendant's attorney had the ultimate authority and discretion to hire NLPA.

Johnson contacted NLPA in early 2000 after learning of the organization from a fellow inmate at the St. Clair County Jail, and Robinson replied by letter containing a promotional brochure entitled, "Helpful tips you should know when you've been BUSTED!" Convinced of the necessity of Appellants' services to the success of his defense, Johnson insisted that Kavanaugh enlist NLPA's assistance. Relying on his own professional judgment, however, Kavanaugh declined to associate himself with Appellants, prompting Johnson's disciplinary complaint against Kavanaugh and Kavanaugh's subsequent motion to withdraw as Johnson's counsel.

In June 2000, Chief Judge G. Patrick Murphy[2] heard Kavanaugh's withdrawal motion. Prior to excusing Kavanaugh, the court inquired of, and Kavanaugh confirmed, Appellants' involvement in the case. Concerned that Appellants might have interfered with Kavanaugh's representation of Johnson, the court reacted as follows:

> Well I'll tell you. This is about—there is a group from Cincinnati, and frankly, I've had them before, and

---

[2] Though Chief Judge Murphy was not installed as Chief Judge of the United States District Court for the Southern District of Illinois until October 2000, we refer to him here and throughout as "Chief Judge Murphy."

they're, at best, dimwits, and they give advice to these defendants, who, God bless them, don't know any better, and they muck up the cases, and they're never here when you need them, and I'm full of it, and I'm going to prepare the necessary orders, and I'm going to have whoever they are in Court for practicing law here in Illinois through the mail. I'm going to have them here, and they're going to be sitting right in front of me, and I'm going to have some questions of them.

On July 11, 2000, pursuant to the district court's inherent powers, Chief Judge Murphy filed an order to show cause why Appellants should not be held in contempt of court for engaging in the unauthorized practice of law and why the court should not issue a cease and desist order against their practicing law in the Southern District of Illinois. He further ordered Robinson to appear personally at a hearing on the order to show cause and to bring with him a list of all cases in the Southern District of Illinois in which Appellants had advised criminal defendants or contacted incarcerated defendants.[3]

At the September 6, 2000, hearing on the order to show cause, the district court heard evidence of Appellants' conduct in connection with Johnson's case and others before the U.S. District Court for the Southern District of Illinois. Ultimately, the district court did not hold Appellants in contempt, but it did determine that they had engaged in the unauthorized practice of law in cases other than Johnson's. Chief Judge Murphy reasoned that the practical effect of Appellants' unsolicited marketing activities targeting criminal defendants was to interfere with

---

[3] On September 5, 2000, this Court denied Appellants' (i) application for a writ of mandamus to challenge the district court's July 11, 2000, order and (ii) emergency motion to stay further district court proceedings.

the attorney-client relationship.[4] By making procedural and strategic recommendations to clients, Appellants indirectly pressured defense attorneys to pursue certain courses of legal action. An attorney who refused to comply with Appellants' legal advice risked losing the confidence (and, consequently, the employ) of his client.[5] Chief Judge Murphy characterized the situation as one "where the NLPA is foisting their services on an unwilling attorney," effectively hijacking the professional decision-making authority of defense counsel. The district court concluded that, insofar as they created a practical reversal of the traditional roles of supervising attorney and subordinate paralegal, Appellants' activities exceeded the scope of their permitted paralegal function and reached the level of practicing law.

In an order entered on October 22, 2001, the district court placed restrictions on Appellants' permitted paralegal activities in the Southern District of Illinois and required Appellants to file a signed declaration of fees received in exchange for unauthorized legal services, totaling $22,177.00, to be paid into the court as a monetary

[4] Chief Judge Murphy further declared that "the business of marketing to these defendants directly, who then come to their lawyer and say, we want to file this, these days are over. I believe that is a blatant practice of law."

[5] In fact, Appellants' marketing strategy is founded upon the introduction into the mind of potential clients doubt as to the competence of their attorneys. For example, one of NLPA's promotional brochures warns defendants that "you, and perhaps even your attorney, are now sailing into previously uncharted waters," and suggests that NLPA's services will protect defendants from "mistakes most often made by defendants under pressure from their own lawyers and the government."

sanction.[6] In January 2002, the district court denied Appellants' request for a reduction of the monetary sanction and directed the Clerk of Court to disburse the returned funds to family members of all but two of the defendants listed in Appellants' declaration of fees. For the remaining two, either family members were unavailable or Appellants had not been retained by family members or an attorney of record. The court directed that those funds, totaling $7000, be disbursed to the Greater East St. Louis Community Fund.[7] The district court also discharged the order to show cause and directed the Clerk to forward a copy of the Memorandum and Order to the Disciplinary Counsel of the Supreme Court of Ohio.

Appellants contest the district court's finding that they engaged in the unauthorized practice of law and its imposition of the monetary sanction.

---

[6] The order prohibited Appellants from (i) directly soliciting criminal defendants or their families; (ii) sending promotional materials to criminal defendants or their families; (iii) providing research or consulting services to any criminal defendant without an authentic and bona fide request from defense counsel; and (iv) supervising or purporting to supervise decisions of defense counsel. The order further required Appellants, prior to providing any services, (i) to obtain signed authorization from defense counsel and (ii) to disclose fully to the defendant and his family NLPA's limited role as a strictly paralegal service.

[7] The Greater East St. Louis Community Fund was established by U.S. District Judge William D. Stiehl in 1991 as a pecuniary community service alternative to traditional criminal fines. Money paid into the Fund is used to provide educational, health, and other community services to citizens of greater East St. Louis, Illinois. Judge Stiehl retains jurisdiction over the Fund.

**ANALYSIS**

I. *Invocation of Inherent Powers*

Appellants challenge the district court's authority and jurisdiction, pursuant to its inherent powers, to determine that they engaged in the unauthorized practice of law and to impose sanctions therefor. They argue that the court's investigation of and imposition of sanctions for unauthorized practice unrelated to defendant Johnson's case exceeded the scope of its subject matter jurisdiction, since any issue outside Johnson's case did not amount to a live case or controversy. Appellants further contend that, in making a finding of unauthorized practice of law outside Johnson's case, the district court usurped the state statutory procedure for regulating the practice of law and improperly assumed the "roles of complainant, prosecutor, judge and jury."

Whether the district court properly invoked its inherent powers is a question of law reviewable de novo. *Kovilic Constr. Co., Inc. v. Missbrenner*, 106 F.3d 768, 771 (7th Cir. 1997). The Supreme Court has characterized the inherent powers of a federal court as follows:

> It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum, in their presence, and submission to their lawful mandates." These powers are "governed not by rule or statute but by the control necessarily vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."

*Chambers v. NASCO*, 501 U.S. 32, 43 (1991) (*quoting United States v. Hudson*, 11 U.S. 21, 23 (1812); *Anderson v. Dunn*, 19 U.S. 93, 103 (1821); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1961)). Though they are broad in scope, "because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

Key among the inherent powers incidental to all courts is the authority to "control admission to its bar and to discipline attorneys who appear before it," *id.* at 43 (*citing Ex parte Burr*, 22 U.S. 529 (1824)), and, as we have noted previously, "a federal court has the inherent power to sanction for conduct which abuses the judicial process." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993). It follows logically that a federal court's power to regulate and discipline attorneys appearing before it extends to conduct by nonlawyers amounting to practicing law without a license.[8] Moreover, considering the serious threat that the unauthorized practice of law poses both to the integrity of the legal profession and to the effective administration of justice, resort to the inherent powers (which, as we stated in *United States v. Giannattasio*, 979 F.2d 98, 101 (7th Cir. 1992), are "rooted considerations of institutional self-defense") is an appropriate remedial measure.

Despite Appellants' arguments to the contrary, the fact that state law provides penalties for the unauthorized practice of law does not limit by itself a federal court's

---

[8] This logical extension of the inherent powers is consistent with the Supreme Court's reasoning in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) ("The power of a court over the members of its bar is at least as great as its authority over litigants."). This power must also extend to nonmembers of the bar who nonetheless engage in unauthorized activities impacting matters pending before a court.

exercise of the inherent power to address the same problem.[9] This Court has suggested that the inherent powers are proscribed to the extent that their exercise conflicts with available constitutional and statutory provisions. *See*, *e.g.*, *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1059 (7th Cir. 2002). The existence of controlling statutory or constitutional authority alone, however, does not preclude the court's invocation of its inherent powers. *Chambers*, 501 U.S. at 48. So long as the inherent powers are exercised in harmony with applicable statutory or constitutional alternatives, then the latter need not displace the former. *G. Heileman Brewing Co. v. Joseph Oat Co.*, 871 F.2d 648, 652 (7th Cir. 1989) (en banc). Here, we find no conflict between the district court's imposition of sanctions pursuant to the exercise of its inherent power and the state means of enforcing the requirement that one obtain a license in order to practice law in Illinois, noting the state provision explicitly reserving Illinois courts' "inherent right to punish for contempt or to restrain the unauthorized practice of law." 705 ILL. COMP. STAT. 205/1-1 (1990).

---

[9]   Illinois statute provides, in relevant part, as follows:

> Any person practicing, charging or receiving fees for legal services within this state, either directly or indirectly, without being licensed to practice as herein required, is guilty of contempt of court and shall be punished accordingly, upon complaint being filed in any Circuit Court of this State. Such proceedings shall be conducted in the Courts of the respective counties where the alleged contempt has been committed in the same manner as in cases of indirect contempt and with the right of review by the parties thereto.
>
> *The provisions of this Act shall be in addition to other remedies permitted by law and shall not be construed to deprive courts of this State of their inherent right to punish for contempt or to restrain the unauthorized practice of law.*

705 ILL. COMP. STAT. 205/1-1 (1990) (emphasis added).

Finally, we find no fault with the district court's assumption of the roles of complainant, prosecutor, judge, and jury in reaching its determination that Appellants were engaged in the unauthorized practice of law, since the court's inherent authority includes the "power to conduct independent investigations in order to determine whether the court has been the victim of fraud or deceit." *Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1200 n.2 (7th Cir. 1996). Any unauthorized practice of law impacting federal court proceedings necessarily raises the specter of interference with that court's function in a manner effectively indistinguishable from fraud or deceit. The inherent power of the federal courts is thus a proper basis for the imposition of sanctions for the unauthorized practice of law.

## II. *Unauthorized Practice Finding*

Appellants also challenge the sufficiency of the evidence upon which the district court based its finding that they engaged in the unauthorized practice of law. The issue of whether Appellants engaged in the unauthorized practice of law requires us to examine, as a preliminary matter, what constitutes the practice of law.[10] In Illinois, the

---

[10] One commentator has aptly described the practice of law in the following general terms:

Decisions indicate that the practice of law generally includes not only the conduct of litigation and appearances in court, but also the preparation of pleadings and other papers incident to any action or special proceeding in any court or other judicial body; conveyancing, the preparation of all legal instruments of all kinds whereby a legal right is secured, the rendering of opinions as to the validity or invalidity or the title to real or personal property, the giving of any legal advice, and any action for others in any matter connected with the law.

(continued...)

practice of law includes, at a minimum, representation provided in court proceedings along with any services rendered incident thereto, even if rendered out of court. *In re Herrera*, 194 B.R. 178 (Bankr. N.D. Ill. 1996); *People v. Peters*, 141 N.E.2d 9 (Ill. 1957). More generally, providing *any* advice or other service "requiring the use of any legal skill or knowledge, . . . the legal effect of which, under the facts and conditions involved, must be carefully determined," amounts to practicing law. *Peters*, 141 N.E.2d at 11. Only under the direct supervision of a licensed attorney may certain of these functions be performed by a paralegal. Absent the imprimatur of meaningful attorney supervision, any legal advice or other legal service provided by a nonlawyer constitutes the unauthorized practice of law.

What the district court found problematic about Appellants' activities was not the performance of those permitted paralegal functions. The preparation of pretrial motions and other services offered by Appellants, including recommendations vis-a-vis litigation strategy, might have been permissible if performed at the request and under the direction of a lawyer.[11] Rather, what troubled Chief Judge Murphy was the reality that Appellants operated without—and, in some cases, in contravention of—attorney oversight. Appellants' promotional literature alone, while not the only evidence upon which the district court relied, is a sufficient evidentiary basis for finding that Appellants' conduct improperly inverted the at-

---

[10] (...continued)

Comment, *Unauthorized Practice of Law: Remedial Procedures*, 1 DEPAUL L. REV. 108 (1952) (internal citation omitted).

[11] In fact, the prospective restrictions on Appellants' conduct in the Southern District of Illinois set forth in the October 2001 order suggest as much.

torney-client-paralegal dynamic.[12] Once Appellants, through their aggressive marketing techniques, undermined a defendant's confidence in his or her counsel, and then exploited those doubts to make strategic recommendations to—and, in the words of the district court, "to foist their services upon"—both client and counsel, any appearance of attorney supervision became meaningless. The district court therefore properly determined that Appellants were engaged in the unauthorized practice of law.

### III. *Imposition of Sanctions*

Having determined the propriety of the district court's invocation of its inherent powers and its finding of unau-

---

[12] The following passage from NLPA's promotional materials is illustrative:

> **A word of warning:** If, after having reviewed this information, you are interested in having [NLPA] assist your counsel with your case, keep in mind that many attorneys become extremely paranoid when they know that their client is considering asking NLPA to become involved in working on the "defense team." [I]f your attorney appears reluctant to have NLPA become involved, or if he tells you he "knows everything" and that there is nothing NLPA could bring to your defense team, you need to give serious thought to his real motive for making such a statement . . . . Keep in mind, *this is your life* and you as the defendant have every right to have as much assistance from any source that you deem appropriate. [sic] Your attorney works for you, you do not work for him. Therefore, should you decide to have NLPA assist you, when you speak with your attorney about this matter, be firm in explaining to him that although you appreciate all that he is doing to try and help, you want to have NLPA involved in the case and that you, as his client, are instructing him to work with us.

(Emphasis in original).

thorized practice of law, we now review the sanctions specifically imposed, which we will set aside only upon a finding that the district court abused its discretion. *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1066 (7th Cir. 2000).

Because the inherent powers are so broad in scope, they are to be narrowly tailored in their application. *Chambers*, 501 U.S. at 44-45 (stating that discretion requires a court "to fashion an appropriate sanction for conduct which abuses the judicial process."); *see also Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) (stating that, when resorting exercise of the inherent power, "as in all cases, the punishment must fit the crime."). In other words, a federal court's wide discretion as to *whether to invoke* the inherent powers is tempered by its rather limited discretion as to *how it exercises* them. Careful, case-specific consideration is owed therefore not only to the character of the sanctionable conduct, but also to the nature and purpose of the sanctions.

Of particular relevance here is the apparent absence of any bad faith on the part of Appellants, despite the dubiousness—both legally and ethically—of their "paralegal" activities. Generally, the harshest of sanctions based on inherent powers have been upheld only in situations involving bad faith, contumacy, or egregious misconduct. *Chambers*, 501 U.S. at 45-46; *see also Kovilic*, 106 F.3d at 773. Conversely, misconduct that is merely questionable warrants a less severe sanction (no matter how "dimwitted" the offenders or how badly they "muck up the cases"). In its finding that Appellants were engaged in the unauthorized practice of law, the district court did not indicate that they acted in bad faith; nor do we discern any such indication. Moreover, we note that the record of the district court proceedings reflects Appellants' sustained cooperation throughout. These factors militate in favor of imposing more moderate sanctions and, in fact, may

have influenced the district court's decision to discharge the order to show cause without a contempt finding.

Appellants argue, and we agree, that the imposition of *punitive* sanctions is inconsistent with a finding that they were not in contempt of court. This argument begs the central question of our inquiry into the purpose and nature of the sanctions: Are the monetary sanctions imposed here punitive in nature?[13] Had Chief Judge Murphy held Appellants in contempt of court, as he might have, this Court could have inferred some punitive intent on his part.[14] Instead, as we noted above, he placed prospective restrictions on their activities and ordered the return of fees received. To the extent that these measures are remedial in nature, we find that the district court acted within its discretion. The restrictions and the return of fees *to clients or their families* are consistent with this finding. However, we regard the order to disburse certain fees to the Fund, insofar as it does not compensate the individuals who paid for unauthorized legal services, and in light of the purpose of the Fund, to be punitive in nature. In short, the fees to be disbursed to the Fund amount to a $7000 fine. Considering that (i) the district court made no contempt finding, (ii) Appellants' misconduct was not in bad faith, and (iii) the sanctions imposed tend to be more remedial than punitive with the exception of

---

[13] Rather than raise this question, Appellants simply argue that the imposition of punitive sanctions in the absence of a contempt finding amounts to a violation of their constitutional right to due process. However, because we find that the punitive sanctions exceed the discretion of the district court, and modify them accordingly, we need not reach the constitutional issue.

[14] Leaving aside for the moment the various distinctions in the law of contempt of court (civil, criminal, direct, constructive, etc.), we note only that contempt is a *possible* indicator of a court's intent to punish.

the $7000 ordered to be disbursed to the fund, we find that the district court abused its discretion with respect to that amount. In a manner consistent with the disposition of this appeal, the Clerk of Court for the Southern District of Illinois is hereby directed to return $7000 to Appellants.

## CONCLUSION

The district court properly invoked its inherent powers to determine that Appellants were engaged in the unauthorized practice of law in the Southern District of Illinois and to impose remedial sanctions therefor. However, the court abused its discretion in imposing punitive sanctions in the amount of $7000. For these reasons, we AFFIRM the orders of the district court in part, and REVERSE that portion of its order directing Appellants to pay into the court, and the Clerk of Court to disburse to the Fund, $7000 in fees received.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*