NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0080n.06

No. 21-3252

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Feb 09, 2023
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

ELMER CURTIS JONES,

  Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: MOORE, CLAY, and NALBANDIAN, Circuit Judges.

**CLAY, Circuit Judge.** Following a trial by jury, Defendant Elmer Jones appeals his conviction on four counts of possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (methamphetamine), (b)(1)(B)(i) & (vi) (heroin/fentanyl mixture); (b)(1)(C) (LSD), and (b)(1)(D) (marijuana), as well as one count of possessing a firearm in furtherance of those offenses, 18 U.S.C. § 924(c)(1)(A)(i)). Jones argues on appeal that the district court violated his rights to a speedy trial, to counsel, and to cross-examine a witness adequately. In addition to alleging various other due process violations, he argues that the district court's within-guidelines sentence was substantively unreasonable. The Court **AFFIRMS** for the reasons set forth below.

## I. BACKGROUND

### A. Factual Background

On February 4, 2020, police officers found Jones asleep at the wheel of a car in the middle of an intersection with the engine running and with his foot on the brake. The officers searched Jones' car and discovered methamphetamine, marijuana, heroin, fentanyl, cocaine, and LSD, as well as a firearm and ammunition. Law enforcement officers arrested Jones on February 12, 2020. Three weeks later, on March 4, 2020, a grand jury indicted Jones on four counts of possession with intent to distribute and one count of possession of a firearm in connection with the drug offenses. The following procedural history is relevant to Jones' appeal.

### B. Procedural History

#### 1. Jones' Multiple Attorneys

Jones had multiple attorneys represent him throughout his criminal proceedings. By March 2020, Jones had retained attorney Matthew Pappas, whom the district court admitted *pro hac vice*. Over the next two months, Pappas proved that he was not adequately up to the task of representing Jones. Pappas failed to meet deadlines and failed to communicate with Jones, leading the district court to observe that "[b]y all appearances, Attorney Pappas has spent the 90 days since his last contact with his client doing nothing in this matter beyond filing a cursory motion for bond . . . ." Order to Show Cause, R. 25, Page ID #72–74. Based upon Pappas' negligent representation of Jones, the district court ordered Pappas to show cause why it should not revoke Pappas' *pro hac vice* status. Pappas responded that he "believe[d] it would be better for Mr. Jones to have different counsel in this case . . . . So, I voluntarily relinquish *pro hac vice* status." Resp. to Order to Show Cause, R. 28, Page ID #85–86. Four days later, Pappas filed a supplemental response in which he

reiterated that he was unable to represent Jones "properly." Suppl. Resp. to Order to Show Cause, R. 30, Page ID #89.

Subsequently, the district court conducted a hearing on its order to show cause. Pappas failed to appear, and Jones informed the court that Pappas had not communicated with Jones "[s]ince the last court hearing . . . ." Hr'g Tr., R. 140, Page ID #2803. With that knowledge, the court informed Jones that it did "not believe that [Pappas will] be able to continue to represent [Jones] in this matter." *Id.* at Page ID #2803–04. The court then asked Jones whether he wished to have the court appoint new counsel. Jones responded that although he would "rather [not have] new counsel until this process is completed," he "guess[ed that he had] no other option." *Id.* at Page ID #2804–05. When asked whether he could afford new counsel, Jones responded, "I don't have nothing else." *Id.* at Page ID #2805.

The next day, the district court removed Pappas as Jones' attorney. The court observed that it had "made every effort to allow Mr. Jones to retain his counsel of choice," but that Pappas "has shown no willingness to act as counsel for Mr. Jones." Order, R. 32, Page ID #95. Accordingly, the court concluded that "allowing Attorney Pappas to continue as counsel would present a grave threat to Mr. Jones' right to *effective* representation." *Id.* at Page ID #96.

The court appointed Attorney Damian Billak to represent Jones. Approximately ten weeks later, Jones sent the district court a letter complaining about the quality and quantity of his communication with Billak. Jones asked the court to hold Billak "to the same standard" to which it held Pappas. Letter, R. 40, Page ID #129. Later that month, the court conducted a status conference during which Jones reiterated his complaints. Following that hearing, Billak moved to withdraw as Jones' counsel, citing a "breakdown in the attorney-client relationship." Mot. to Withdraw as Counsel, R. 43, Page ID #133. Two weeks later, the district court denied Billak's

motion. Billak moved again to withdraw as counsel two weeks later. Through that motion, Billak averred that "a complete breakdown in the attorney-client relationship has occurred making it impossible for counsel to continue representing" Jones. Mot. to Withdraw as Counsel, R. 54, Page ID #208.

### 2. John Pappas' Involvement

In late October 2020, around the time that Billak filed his second motion to withdraw, the district court issued an order stating that it was "in receipt of an e-mail . . . from John Pappas."[1] Order, R. 55, Page ID #210. Through that e-mail, John[2] offered to "assist" Billak in Jones' defense. E-mail, R. 55-1, Page ID #211. In fact, John went so far as to attach to his e-mail a draft speedy trial motion. John also accused Billak of lacking "courtesy" and "professionalism," and of "whin[ing] to" the court. *Id.* at Page ID #214.

That same day, the court held a pretrial hearing. During that hearing, the court addressed Billak's motions to withdraw, as well as John's e-mail and proposed motion. Billak expressed to the court his concern that John was acting as shadow counsel. Billak insisted, moreover, that John was "undermining [Billak's] ability to completely represent" Jones. Pretrial Hr'g Tr., R. 131, Page ID #2047. The court alerted Jones that John was not admitted to practice before the court, and that John's communication with Jones was "totally improper." *Id.* at Page ID #2048. The court also advised Jones that, based upon the quality of John's draft speedy trial motion, John "clearly does not understand the law . . . ." *Id.* at Page ID #2049. At the same time, however, the court told Jones that he was free to continue relying upon John's advice. Indeed, the court noted that it was *unable* to stop Jones from speaking to John.

---

[1] As the district court subsequently learned, John Pappas is Matthew Pappas' father.

[2] The Court refers to John Pappas by his first name to differentiate John from his son. In doing so, the Court intends no disrespect to John.

The court denied Billak's second motion to withdraw. It then called John in the presence of the parties. John represented to the court that he was a pilot, and that he was Matthew Pappas' father. The court advised John that he was interfering with Jones' right to an effective attorney. Responding, John insisted that he had "every right in the world to communicate with" Jones, and that he could "advise" Jones as he saw fit. *Id.* at Page ID #2057. The court reiterated that it could not "stop [John] from communicating with [Jones] and giving him advice." *Id.* It added, however, that it *could stop* John from sending Jones draft pleadings and interfering with Billak's representation of Jones. *Id.* at Page ID #2062–63. The court continued:

> I'm making this call simply as a courtesy. Rather than issue some sort of order seeking other action by this Court . . . or perhaps even by our chief judge based upon your conduct, this is a courtesy call, in essence encouraging you to cease and desist from interfering with this case, this defendant's rights.

*Id.* at Page ID #2063. The court then emphasized that it had other, harsher options:

> The other option for me would be to issue a show cause order as to why you should not be held in contempt for either attempting to practice law or engaging in some other conduct.

*Id.* at Page ID #2067.

The court's analysis of the situation changed, however, when John alerted the court that he had previously been a practicing lawyer. At that point, the court told John:

> if you wish to represent the defendant, you are not licensed to practice in Ohio . . . . In order to participate in this case—if you want to represent the defendant, then you can file a *pro hac vice* . . . . You can't have it both ways. You cannot be sitting on the sidelines giving the defendant legal advice. When you submit draft motions to the defendant, there is no other way to characterize it, in my humble opinion, than practicing law or attempting to practice law.

*Id.* at Page ID #2070–71. Beyond warning John that he might be engaging in the unauthorized practice of law, the court also informed John that his draft motion was "patently not well-taken" and that he was leading Jones down a "primrose path." *Id.* at Page ID #2072. Shortly after the

court issued those warnings, John admitted that he "was either disbarred or [] resigned" from the California State Bar.[3] *Id.* at Page ID #2074–75.

The court then spoke to Jones directly, warning him against relying on "a lawyer who has been either disbarred or resigned from the California Bar who couldn't practice in this Court if he wanted to." *Id.* at Page ID #2075. After issuing that warning, the court told John that it "strongly encourage[d him] to stop interfering in Mr. Jones's representation" and that he was "not licensed" and "*not permitted* to practice law." *Id.* at Page ID #2075–76 (emphasis added). The court recommended that John speak with an attorney regarding his actions and his potential legal liability.

After the court ended the telephone call with John, it spoke to Jones once more. The court noted that while it could not stop Jones from listening to John, it could emphasize that John had been disbarred from or disciplined by the California Bar and that John might have ulterior motives. Accordingly, the court recommended that Jones "sit down" with Billak and discuss his options.

That same day, the court issued an order addressing the substance of John's draft speedy trial motion. The court noted that "[w]hile the correspondence from John Pappas is not a properly filed motion for this Court to consider, the Court feels compelled to address its substance in the hopes of demonstrating to Jones the dangers presented when he chooses to rely on advice from a functionally-disbarred attorney." Order, R. 56, Page ID #221. The court rebuked the arguments put forward in John's draft motion and concluded that:

> to the extent that Jones seeks to adopt as his own the proposed motion to dismiss provided by John Pappas, the motion is DENIED. The Court is hopeful that its prompt analysis of this issue will highlight to Jones that his interests would best be served by relying upon counsel that are properly admitted to practice before this Court and who are actively attempting to assist him in his defense. While the Court cannot and will not play any role in restricting Jones' contact with others, the

---

[3] Later, the Court learned that John "resigned his law license while facing discipline charges that could have led to him being disbarred." Order, R. 56, Page ID #220.

> Court's analysis herein should highlight the significant deficiencies in the advice that Jones' has been receiving from these third parties.

*Id.* at Page ID #226.

### 3. Jones' Proffer

In March 2020, before John entered the picture, Jones provided a proffer to law enforcement officials. Subsequently, an FBI agent prepared an FBI Form 302, which purportedly sets forth the information Jones provided through his proffer. Through the proffer agreement, Jones agreed that if he offered testimony or arguments that were inconsistent with the proffer, the government could use the proffer for impeachment. According to the Form 302, Jones admitted that he purchased large amounts of methamphetamine on at least two separate occasions. He admitted that in February 2020 he had picked up 16 pounds of methamphetamine from "AK" in Akron and then recalled nothing about that day "until he was contacted by law enforcement approximately 10 hours later." Sealed Proffer, R. 86-2, Page ID #1484.

At trial, a police officer who was present during Jones' arrest testified that he observed a large amount of what he believed to be methamphetamine in Jones' car. During cross examination, Billak asked that officer whether he fingerprinted or swabbed any of the seized evidence. The government objected to Billak's question, asserting that it was "misleading to the jury." Trial Tr., R. 138, Page ID #2574. Specifically, the government contested that Jones "admitted that the methamphetamine in the trunk was his" in his proffer. *Id.* The court warned Billak that he needed "to be cautious." *Id.* at Page ID #2575. Later, the court told Billak:

> you will not, throughout any additional cross-examination, elicit any testimony from any witness about the methamphetamine, period. The defendant admitted the methamphetamine was his. So those questions about fingerprints . . . are clearly in violation of the proffer agreement . . . .

*Id.* at Page ID #2595. The court then informed Billak of the consequences of violating the proffer

agreement:

> the proffer may be used for impeachment . . . . So if in in fact there is any other testimony regarding the methamphetamine, or attempts, then as I read the case law, then the remedy is going to be the Agent is going to get . . . on the witness stand and [is] going to be able to testify the defendant admitted the methamphetamine was his. And that would be before the jury. And I do not want that to happen.

*Id.*

### 4. From Indictment to Trial

Although a grand jury indicted Jones in March 2020, Jones' trial did not commence until

late November of that year. The district court explained the delay through various orders. In sum,

the district court delayed trial because of: (1) Pappas' failure to work on Jones' behalf; (2) Billak's

need to meet with Jones upon taking over Jones' representation; and (3) the Northern District of

Ohio's general orders regarding the COVID-19 pandemic.

First, Pappas represented Jones from February 28, 2020, until June 16, 2020. The district

court determined that because Pappas failed to function effectively as Jones' attorney, it must

exclude that time frame from the speedy trial clock calculation. Second, the district court

appointed Billak to serve as Jones' attorney on June 16, 2020. The court determined that "due to

the ongoing COVID-19 pandemic, Attorney Billak did not receive immediate access to consult

with his client." Order, R. 38, Page ID #116. Accordingly, the court excluded the dates between

June 16, 2020, and August 13, 2020, from the speedy trial clock calculation. Third, the Northern

District of Ohio issued its first general order related to the COVID-19 pandemic on March 16,

2020. That general order provided that "[c]riminal trials will not proceed unless absolutely

necessary." Order, R. 56, Page ID #223. The Northern District maintained that rule until

September 21, 2020. The district court therefore concluded that the Northern District's general

orders effectively suspended Jones' speedy trial clock from March 16, 2020, until September 21, 2020.

As discussed above, the district court ruled on and rejected John's draft speedy trial motion in October. In early November, Jones filed a *pro se* speedy trial motion that was substantially similar to John's draft motion. In that motion, Jones contended that the district court had violated his right to a speedy trial because, among other reasons, he never waived his right to a speedy trial and never consented to a continuance. The court denied that motion for the same reasons it rejected John's arguments.

Thus, the district court calculated Jones' speedy trial clock as starting on September 21, 2020, and ending on November 20, 2020, when Jones' trial began. Even if the district court did not pause the speedy trial clock again—*e.g.*, while considering Billak's motion to withdraw—the district court would have calculated the speedy trial clock at 60 days.

Nine days before trial, one of Jones' witnesses alerted the district court that she could no longer testify because her recollection of events had diminished, and because she had lost the relevant text messages.

### 5. Sentencing

After the jury found Jones guilty, the probation department determined that Jones' total offense level for the drug offenses was 34 because of the quantity of drugs recovered. The probation department accounted for Jones' gun offense separately based upon the statutory mandatory minimum consecutive sentence. *See* U.S.S.G. § 3D1.1(b)(1). Finally, the probation department determined that Jones had four criminal history points, corresponding to Criminal History category III. Based upon those calculations, the probation department determined that

Jones' guidelines range for Counts 1 through 4 was between 188 and 235 months, with an additional 60-month consecutive sentence for Count 5.

Through his sentencing memorandum, Jones concurred with the probation department's calculations. At the same time, he sought the "minimum sentence available within the applicable guideline range." Sentencing Mem., R. 104, Page ID #1858. Jones reasoned that such a sentence would "balance the need for incarceration relative to the seriousness of his conduct" because Jones:

> was not a manager and was not an organizer. There is no identified victim in this matter and these are not crimes of violence. He has the support of his family. [Jones] understands that he will be going to prison, but has fashioned a plan for his time in prison and his life when he is released. He plans on engaging in vocational training [in the] . . . HVAC, Electrician or Construction and Building Inspection fields.

*Id.* In addition, Jones noted that he grew up surrounded by abuse, poverty, crime, and addiction.

At his sentencing hearing, Jones addressed the court. He highlighted the adversity he faced during his childhood and averred that "[i]t wasn't until recently" that he "decided to sacrifice some morals and seek financial success by nefarious means." Hr'g Tr., R. 144, Page ID #2867. At the same time, even as he committed crimes, he "saw himself as some type of Robin Hood, because he tended to give much of the proceeds" of his criminal activities "to single mothers and sponsor youth organizations." *Id.* at Page ID #2867–68. Nevertheless, Jones recognized that there was "no excuse" for his actions. *Id.* at Page ID #2868. Accordingly, Jones realized that his behaviors "contributed to the cycle" of drug addiction and he therefore felt "remorse for his actions . . . ." *Id.* The district court found Jones' apology insufficient.

The government requested a high-end sentence. The district court agreed. The court reached that conclusion after considering the nature of Jones' crimes, including the amount of drugs in Jones' possession; Jones' personal and criminal history; Jones' difficult childhood; and sentencing disparities. The court also observed that Jones' statement to the court indicated "a

complete lack of responsibility for his conduct, a complete lack of understanding [of] the dangers that the drugs that he was distributing" posed to the community. *Id.* at Page #2879. Accordingly, balancing the relevant factors, the court sentenced Jones to 270 months. Jones' timely appeal followed.

## III. DISCUSSION

On appeal, Jones argues that the district court violated his rights to a speedy trial, to cross-examine a witness adequately, and to counsel. He also avers that the district court failed to deal adequately with John Pappas, and that its within-guidelines sentence was substantively unreasonable. The Court addresses each issue in turn.

### A. Speedy Trial

#### 1. Standard of Review

In determining whether a district court violated a defendant's rights under the U.S. Constitution or the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.*, the Court reviews questions of law *de novo* and questions of fact for clear error. *See United States v. Schreane*, 331 F.3d 548, 553 (6th Cir. 2003); *United States v. Jordan*, 544 F.3d 656, 663 (6th Cir. 2008).

#### 2. Analysis

##### a. Speedy Trial Act

The Speedy Trial Act (the "Act") provides that a criminal defendant's trial must "commence within 70 days after he is charged or makes an initial appearance, whichever is later . . . ." *Bloate v. United States*, 559 U.S. 196, 198–99 (2010) (citing 18 U.S.C. § 3161(c)(1)). The Act entitles a defendant "to dismissal of the charges if that deadline is not met . . . ." *Id.* at 199 (citing § 3162(a)(2)). However, the Act provides several exceptions to that 70-day deadline.

*See* § 3161(h). Because Jones' trial began more than eight months after Jones was indicted, the issue is whether any of those exceptions apply.

A district court may continue trial beyond the 70-day deadline if it determines "that the ends of justice" require delay. § 3161(h)(7)(A). In conducting an ends of justice analysis, a district court must consider whether the failure to grant a continuance "would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." § 3161(h)(7)(B)(i). The district court must also consider whether the failure to grant a continuance "would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." § 3161(h)(7)(B)(iv). An ends of justice continuance "does not require a defendant's consent to the continuance . . . ." *United States v. Sobh*, 571 F.3d 600, 603 (6th Cir. 2009) (citing § 3161(h)(8)(A), *now codified at* § 3161(h)(7)(A)). The district court must, however, "set forth its reasons for granting an 'ends of justice' continuance on the record, either orally or in writing." *United States v. Cianciola*, 920 F.2d 1295, 1299 (6th Cir. 1990) (quoting *United States v. Richmond*, 735 F.2d 208, 215 (6th Cir. 1984)).

In his brief, Jones avers inaccurately that the reason for the eight-month gap between indictment and trial "was that the government never made a plea offer." Pet'r's Br. at 21. As mentioned above, the district court delayed Jones' trial because of: (1) Pappas' failure to work on Jones' behalf; (2) Billak's need to meet with Jones upon taking over Jones' representation; and (3) the Northern District of Ohio's general orders regarding the COVID-19 pandemic. Although Jones asserts that "[t]he length of the delay imposed on Mr. Jones was unreasonable" and had "no

legitimate basis," he fails to address the stated reasons for the delay. Pet'r's Br. at 20–22. Had Jones addressed those reasons, however, his arguments would have failed.[4]

First, the Sixth Circuit has already held that a district court does "not abuse its discretion in finding that the ends of justice served by postponing or limiting jury trials during the pandemic under the General Orders [outweigh a defendant's] right to a speedy trial." *United States v. Roush*, No. 21-3820, 2021 WL 6689969, at \*2 (6th Cir. Dec. 7, 2021); *see also United States v. Olsen*, 21 F.4th 1036, 1047 (9th Cir. 2022) ("[S]urely a global pandemic that has claimed more than [one million lives] . . . in this country falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health."). In this case, because of the COVID-19 pandemic, the Northern District of Ohio issued general orders suspending jury trials from March 16 until September 21. Those orders were temporary and reasonably calculated to abate the spread of a global pandemic and, in turn, save lives. Therefore, the district court rightly excluded the dates from March 16 until September 21 from Jones' speedy trial clock.

Second, the district court explained on the record that Pappas was functionally absent in his role as Jones' attorney. As a result, the court observed that "both Jones and the Government were deprived of any ability to prosecute this matter." Order, R. 38, Page ID #116. Thus, by suspending Jones' speedy trial clock, the district court ensured that both sides had "the reasonable time necessary for effective preparation." § 3161(h)(7)(B)(iv). Accordingly, the district court reasonably excluded the dates during which Pappas represented Jones, February 28 through June 16, from Jones' speedy trial clock.

---

[4] As a threshold matter, Jones does not dispute that the district court satisfied the requirement that it "set forth its reasons for granting an ends of justice continuance on the record . . . in writing." *Cianciola*, 920 F.2d at 1299 (quotation omitted).

Third, a district court may grant an ends of justice continuance "to allow for new counsel to prepare for trial." *United States v. White*, 129 F. App'x 197, 202 (6th Cir. 2005); *see also Cianciola*, 920 F.2d at 1300. In this case, after appointing Billak to represent Jones, the district court observed that "due to the ongoing COVID-19 pandemic, Attorney Billak did not receive immediate access to consult with his client." Order, R. 38, Page ID #116. To give Billak and the Government "the reasonable time necessary for effective preparation," the district court granted a continuance of approximately two months, from June 16 until August 13. *Id.* at Page ID #116–17. This Court defers to the district court's reasonable calculation of the time needed for the parties to prepare effectively.

As mentioned above, considering only the district court's decisions to suspend Jones' speedy trial clock because of COVID-19, Pappas, and Billak, the district court would have calculated the speedy trial clock at 60 days. Because those suspensions were proper, the Court need not consider the district court's other suspensions of the speedy trial clock. The district court did not violate Jones' rights under the Speedy Trial Act.

### b. Constitutional Right to a Speedy Trial

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. To determine whether a person's Sixth Amendment right to a speedy trial has been violated, the Supreme Court considers four factors: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). None of those factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533.

"Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." *Doggett v. United States*, 505 U.S. 647, 651–52 (1992) (quotation omitted). "A delay approaching one year is presumptively prejudicial." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006) (citing *Doggett*, 505 U.S. at 652 n.1). In this case, the delay was less than a year and is therefore not presumptively prejudicial.

The reasons for the delay weigh against Jones' constitutional argument. First, as the Ninth Circuit has observed, "a global pandemic that has claimed more than [one million] lives in this country . . . falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health." *Olsen*, 21 F.4th at 1047. Second, "the prosecution did nothing to cause the delay." *United States v. Woods*, 88 F. App'x 827, 828 (6th Cir. 2004). Instead, the delays unrelated to COVID-19 were caused by Pappas' lack of diligence and Billak's need to catch up. Weighing in Jones' favor, however, are the facts that: (1) he did assert his right to a speedy trial on at least one occasion; and (2) the potential loss of a witness might have caused him prejudice. Nevertheless, those facts are insufficient when weighed against the public health challenges posed by COVID-19, and the fact that Jones' attorneys caused the non-COVID delays. Therefore, the district court did not violate Jones' constitutional right to a speedy trial.

## B. Cross Examination and Impeachment

### 1. Standard of Review

This Court reviews a district court's evidentiary rulings for abuse of discretion. *See United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001) (citing *United States v. Middleton*, 246 F.3d

825, 836 (6th Cir. 2001)). "An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made." *Romstadt v. Allstate Ins. Co.*, 59 F.3d 608, 615 (6th Cir. 1995) (citing *Southward v. S. Cent. Ready Mix Supply Corp.*, 7 F.3d 487, 492 (6th Cir. 1993)). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Id.* (quoting *Southward*, 7 F.3d at 492). The Court reviews the terms of the proffer agreement *de novo*. *United States v. Shannon*, 803 F.3d 778, 783 (6th Cir. 2015).

### 2. Analysis

A proffer "agreement is a contract that must be interpreted to give effect to the intent of the parties." *Id.* (quotation omitted). Although proffer statements are generally inadmissible under Federal Rule of Evidence 410, a defendant "may waive Rule 410 objections, absent evidence that a waiver is unknowing or involuntary." *Id.* (quotation omitted).

In this case, the proffer agreement states (and Jones does not dispute) that Jones agreed that the proffer could be used for impeachment if Jones made arguments that were inconsistent with the proffer. Although the district court appears to have initially *prohibited* Jones' counsel from raising arguments that were inconsistent with the proffer, it later clarified that such arguments opened the door for impeachment. The district court did not abuse its discretion, therefore, when it warned Billak of the implications of pursuing arguments that were inconsistent with the proffer agreement.[5] Indeed, the district court issued its warning to protect Jones' rights.

---

[5] Jones suggests that the Form 302 was not authenticated in accordance with the Federal Rules of Evidence. (Pet'r's Br., ECF No. 39, 40–41). That argument is not well taken, since Jones never challenged the form's authenticity at trial, nor does he challenge it explicitly on appeal.

## C. Right to Counsel

### 1. Standard of Review

This Court reviews a district court's decision to remove or appoint an *indigent* defendant's counsel for abuse of discretion. *See United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007). The Court reviews a "finding of indigency for clear error . . . ." *United States v. Olmstead*, No. 21-1051, 2021 WL 5014358, at *2 (6th Cir. Oct. 28, 2021). Under the clear error standard, this Court will uphold a district court's finding with respect to indigency unless it has "the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Shepherd*, 922 F.3d 753, 759 (6th Cir. 2019)).

### 2. Analysis

This Court presumes that "a defendant *who does not require appointed counsel*" has a right "to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (emphasis added) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). No such presumption exists, however, for an indigent defendant. *See United States v. Iles*, 906 F.2d 1122, 1130–31 (6th Cir. 1990) ("An indigent defendant has no right to have a particular attorney represent him . . . ." (citing cases)). Because Jones concedes Billak's appointment "would have been proper if Jones had asserted indigency," Pet'r's Br. at 24, the dispositive issue is whether the district court erred in finding that Jones was indigent. It did not.

Under the Criminal Justice Act, every United States district court must "place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation . . . ." 18 U.S.C. § 3006A(a). If a defendant *requests* that a district court appoint counsel because of indigency, that court must investigate the defendant's ability to

pay *before denying* that request. *See Wood v. United States*, 389 U.S. 20, 20–21 (1967). The act is silent, however, with respect to how a district court should determine indigency.

Jones argues that the district court violated his rights by appointing Billak because it failed to conduct an adequate investigation into whether Jones was indigent. Pet'r's Br. at 24–26. That argument lacks merit. In his brief, Jones relies on two cases from outside of the Sixth Circuit: *United States v. Rivera-Corona*, 618 F.3d 976, 981 (9th Cir. 2010), and *United States v. Parker*, 439 F.3d 81, 92–93 (2d Cir. 2006). (*Id.* at 25). Those cases are inapposite, since they concern a district court's decision to *deny requests to appoint counsel*. This case concerns something quite different: a district court's decision to appoint counsel absent a formal request. Jones cites no authority, and none appear to exist, suggesting a district court errs when it appoints counsel without a formal investigation of a defendant's indigency.

As discussed above, the district court removed Pappas for legitimate reasons: Pappas' performance was so deficient that even he acknowledged he should be removed. The court then asked Jones whether he could afford new counsel and Jones suggested that he could not. Jones' statement suggesting indigency was consistent with the fact that his first attorney withdrew after financial arrangements with Jones' family fell apart. In addition, Jones never requested time to retain new counsel following Pappas' removal and before Billak's appointment, nor did he ask to proceed *pro se*. The district court therefore did not abuse its discretion in determining that Jones was indigent and appointing counsel thereafter.

### D. Court Imposed Attorney Discipline

#### 1. Standard of Review

Before addressing the standard of review, the Court must determine whether Jones preserved the issue for review. To preserve an issue for appellate review, a litigant must "state the

issue with sufficient clarity to give the court and opposing parties notice that it is asserting the issue" and provide "some minimal level of argumentation in support of it" before the district court. *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009). The litigant must also present the issue in its appellate briefing. *See Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 610–11 (6th Cir. 2016). While Jones does address this issue in his appellate brief, he never complained or otherwise objected to the district court's decisions regarding John. Therefore, Jones failed to preserve whether the district court properly handled John Pappas' actions for appellate review. Jones' failure to preserve the issue does not render it unappealable, but it does affect the standard of review. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008).

"Traditionally, decisions on questions of law are reviewable *de novo*, decisions on questions of fact are reviewable for clear error, and decisions on matters of discretion are reviewable for abuse of discretion." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 (2014) (quotation omitted). When and how a court uses its inherent powers is typically seen as discretionary, and is therefore reviewed for abuse of discretion. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980) ("Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion"); *Kloock v. Runyon*, 22 F. App'x 367, 368 (6th Cir. 2001) (reviewing docketing decision for abuse of discretion); *Am. C.L. Union of Kentucky v. McCreary Cnty., Ky.*, 607 F.3d 439, 451 (6th Cir. 2010) (same). Accordingly, the Court reviews the district court's decisions regarding John for abuse of discretion.[6]

---

[6] Both parties aver that whether a district court properly exercised its inherent powers is a question of law that is subject to *de novo* review. Those averments are unavailing, as they rely on authority from outside this Circuit. *See United States v. Johnson*, 327 F.3d 554, 559–560 (7th Cir. 2003); *Kovilic Const. Co. v. Missbrenner*, 106 F.3d 768, 771 (7th Cir. 1997). As discussed above, this Court reviews such issues for abuse of discretion.

### 2. Analysis

Federal courts possess "implied powers . . . which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quotation and citation omitted). Those "powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quotation omitted). Among those powers is "the power to control admission to its bar and to discipline attorneys who appear before it." *Id.* (citing *Ex parte Burr*, 22 U.S. 529, 531 (1824)). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citation omitted).

The Supreme Court has observed that "[t]he power of a court over members of its bar is at least as great as its authority over litigants." *Roadway Exp.*, 447 U.S. at 766. The Seventh Circuit has built upon that principle, holding that "a federal court's power to regulate and discipline attorneys appearing before it extends to conduct by nonlawyers amounting to practicing law without a license." *United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003). Importantly, the Seventh Circuit found that a district court's exercise of its inherent powers to stop the unauthorized practice of law can be "an *appropriate* remedial measure," *id.* (emphasis added), as opposed to a mandatory one. At least one other United States district court has adopted the Seventh Circuit's reasoning as articulated in *Johnson*. *See In re Nat'l Legal Pro. Assocs.*, No. 1:-08-mc-101, 2010 WL 624045, at *4 (N.D.N.Y. Feb. 18, 2010) (the district court's inherent "power extends to enjoining and sanctioning the unauthorized practice of law."). Although this Court has not addressed this issue directly, we find the Seventh Circuit's precedent to be persuasive. *Cf. Berger v. Cuyahoga Cnty. Bar Ass'n*, 983 F.2d 718, 724 (6th Cir. 1993) ("Federal courts have inherent

authority to discipline attorneys practicing before them and to set standards for their conduct.").

A district court may exercise its inherent powers to stop the unauthorized practice of law.

Jones contends that the district court was *required* to enjoin John from practicing law without a license. Jones cites no authority to support that proposition. Indeed, Jones notes that district courts have "*considerable latitude and discretion* . . . to override a defendant's wish to consult with a particular person and to preclude that person from involvement in the case . . . ." Pet'r's Br. at 35 (quotation omitted) (emphasis added). The issue is therefore whether the district court abused its discretion by not enjoining John from engaging in the unauthorized practice of law.

As mentioned above, the district court: (1) warned John that it would intervene to prevent John from offering Jones legal advice; (2) suggested that John consult with an attorney to determine his own legal liability; and (3) warned Jones that John was giving him poor advice. In other words, the district court acted explicitly and deliberately to prevent John from engaging in the unauthorized practice of law. Such actions do not constitute an abuse of discretion. To hold otherwise would constitute unnecessary second-guessing of a district court's discretionary management of its own cases.

### E. Sentencing

#### 1. Standard of Review

Jones argues that his sentence was substantively unreasonable. The Court reviews a "sentencing decision for substantive reasonableness under the abuse-of-discretion standard." *United States v. Bistline*, 720 F.3d 631, 633 (6th Cir. 2013) (quotation omitted). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable

amount of weight to any pertinent factor." *Id.* (quoting *United States v. Shaw*, 707 F.3d 666, 674 (6th Cir. 2013)).

## 2. Analysis

The Supreme Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." *United States v. Booker*, 543 U.S. 220, 233 (2005) (citations omitted). With that in mind, this Court presumes that within-guidelines sentences are reasonable. *See Vonner*, 516 F.3d at 389. "'Regardless of whether the sentence imposed is inside or outside the Guidelines range,' an appellate court reviews for reasonableness under the same abuse-of-discretion standard." *United States v. Elmore*, 743 F.3d 1068, 1072 (6th Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Because sentencing is "a matter of reasoned discretion, not math," this Court's review of sentencing decisions is "highly deferential." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) (citing *Gall*, 552 U.S. at 51). To that end, while a district court may not give any one sentencing factor an "unreasonable amount of weight," *United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2006) (quotation omitted), the district court "may place great weight on one factor if such weight is warranted under the facts of the case." *United States v. Adkins*, 729 F.3d 559, 571 (6th Cir. 2013) (citation omitted).

Jones does not dispute that the district court considered all relevant factors. The heart of Jones' argument is that the district court: (1) sentenced Jones "as if he were a virtual kingpin"; (2) "disregarded an admittedly huge disparity between defendant Jones and others similarly situated; (3) failed to acknowledge defendant's expression of remorse; and (4) gave excessive weight to defendant's criminal history while simultaneously giving too little weight to his adversity and mental health." Pet'r's Br. at Page ID #42–43. Because the district court considered and balanced all relevant factors and issued a sentence that was within guidelines, Jones has not

rebutted the presumption that his sentence is reasonable. *See Vonner*, 516 F.3d at 390.

Accordingly, the Court affirms the sentence.

### III. CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgment of the district court.